MUNICIPAL INVESTORS ASS'N *v.* CITY OF BIRMINGHAM.

1. Taxation—Purpose of State Land Office Board Act—Collection of Part of Delinquent Tax—Restoration to Tax Rolls.
    The primary and inducing purpose of the State land office board act providing for public auction of lands to which the State had acquired title upon sale for delinquent taxes is to secure a portion of the unpaid taxes, rather than nothing, and to restore the lands to a taxpaying basis, instead of supinely allowing them to accumulate tax delinquencies with no hope of ever recovering them (Act No. 155, Pub. Acts 1937, as amended).

2. SAME—LANDS SOLD AT "SCAVENGER SALE"—IMMEDIATE RESTO
RATION TO TAX ROLLS.

A taxpayer may bring mandamus to compel a city to place on
its tax rolls immediately all parcels of land sold at the so-
called scavenger sale even though the State land office board
has not executed deeds or contracts to the successful bidder as
such lands are subject to taxation when a bid is accepted and
notice of sale given by the agent of the board to the county
treasurer who in turn is obliged to notify the proper assessing officers (Act No. 155, Pub. Acts 1937, as amended by Act
No. 244, Pub. Acts 1939).

3. SAME—STATE LAND OFFICE BOARD ACT—CONSTRUCTION OF
STATUTES.

The State land office board act is remedial legislation and is,
therefore, to be construed liberally (Act No. 155, Pub. Acts
1937, as amended).

4. SAME—CONSTRUCTION OF STATUTES.

In interpreting act relative to "scavenger" sale of lands, the
court is under a duty to draw inferences from the evident intent of the legislature, as gathered from a view of the law in
its entirety, and render effectual the specific things which are
included in the broad and comprehensive terms and purposes
of the law (Act No. 155, Pub. Acts 1937, as amended).

5. STATUTES—TITLE OF ACT—GENERAL PROPERTY TAX LAW.

The general property tax law with title providing, among other
things, "for the sale and conveyance of lands delinquent for
taxes" is not unconstitutional for failure to provide in the
title for the cancellation of past as well as future taxes and
special assessments, or that municipalities which have borrowed in anticipation of the collection of taxes or issued special
assessment bonds shall have such taxes and assessments cancelled, since such details need not be included within the title
(Const. 1908, art. 5, § 21; 1 Comp. Laws 1929, § 3389 et seq.,
as amended by Act No. 114, Pub. Acts 1937).

6. CONSTITUTIONAL LAW—TAX-DELINQUENT LANDS—VESTING OF
TITLE IN STATE—CANCELLATION OF LIENS FOR TAXES AND SPECIAL
ASSESSMENTS—IMPAIRMENT OF OBLIGATION OF CONTRACTS.

In providing for the cancellation of liens for taxes and special
assessments on real estate upon vesting of absolute title in
the State after sale for delinquent taxes and failure of former
owner to redeem and for disposition thereof by the State at
the so-called scavenger sale, neither the general property tax
law nor the State land office board act contravenes the requirements of the Constitutions of the State or United States for-

bidding the impairment of the obligation of contract (U. S. Const. art. 1, § 10; Mich. Const. 1908, art. 2, § 9; 1 Comp. Laws 1929, § 3459, as amended by Act No. 114, Pub. Acts 1937; Act No. 155, §§ 9, 10, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

7. MUNICIPAL CORPORATIONS—BONDS—TAX LIENS.

Purchasers of municipal bonds are assumed to have purchased with knowledge that the lien upon the property securing taxes and assessments for the payment thereof might be displaced (Act No. 155, Pub. Acts 1937, as amended).

8. TAXATION—DELINQUENT TAX LANDS—TITLE OF STATE—CANCELLATION OF LIENS.

Provisions of the general property tax law and the State land office board act relative to vesting of absolute title in the State upon expiration of period of redemption from tax sale and for disposition of such lands thereafter by so-called scavenger sale relieved the owners thereof from the weight of accumulated obligations, title was in the State free from taxes and other liens and incumbrances of whatever kind or nature, and future and deficiency as well as past assessments were cancelled (1 Comp. Laws 1929, § 3459, as amended by Act No. 114, Pub. Acts 1937; Act No. 155, §§ 9, 10, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

9. SAME—TITLE OF STATE—PURCHASER UPON RESALE BY STATE.

When absolute title to lands sold for delinquent special assessments, and bid in by the State, became vested in the State upon expiration of period of redemption, the State had power to dispose of them in any way not contrary to the Constitution and upon resale by the State land office board a new chain of title originated evidenced by a quitclaim deed free from any incumbrances (1 Comp. Laws 1929, § 3459, as amended by Act No. 114, Pub. Acts 1937; Act No. 155, §§ 9, 10, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

10. MANDAMUS—SPECIAL ASSESSMENT BONDHOLDER—CANCELLATION OF LIEN—TITLE OF STATE—DEFICIENCY ASSESSMENT.

The holder of special assessment district bonds, issued in anticipation of the collection of special assessments for a street-paving project, is not entitled to writ of mandamus compelling municipal officers to levy a deficiency assessment after title to most of the property became vested in State upon expiration of period of redemption from sale for delinquent taxes since the lien for the special assessments is then cancelled (1 Comp. Laws 1929, § 3459, as amended by Act No. 114, Pub. Acts 1937).

11. COSTS—PUBLIC QUESTION—DEFICIENCY ASSESSMENT ON SPECIAL
ASSESSMENT DISTRICT.

No costs are awarded in mandamus proceeding to compel mu-
nicipal officers to levy a deficiency assessment against a special
assessment district in which construction of provisions of
statutes relative to title of State acquired under tax-collecting
statutes and sold at so-called scavenger sale is involved (1
Comp. Laws 1929, § 3459, as amended by Act No. 114, Pub.
Acts 1937; Act No. 155, §§ 9, 10, Pub. Acts 1937, as amended
by Act No. 244, Pub. Acts 1939).

Per SHARPE, C. J., and BUSHNELL, BOYLES, CHANDLER, NORTH, and
WIEST, JJ.

12. TAXATION—SPECIAL ASSESSMENTS—LIENS.

A special assessment does not generally become an incumbrance
upon real estate until it has become a lien against the prem-
ises.

13. PROPERTY—INCUMBRANCES—TITLE.

Anything is an incumbrance which constitutes a burden upon the
title of property.

14. TAXATION—CANCELLATION OF INCUMBRANCES—POSSIBILITY OF RE-
ASSESSMENT OF SPECIAL ASSESSMENT.

The possibility of reassessment of a special assessment consti-
tutes an incumbrance cancelled by the general tax law upon
expiration of period of redemption from sale to State of land
bid in by it at tax sale (1 Comp. Laws 1929, § 3459, as
amended by Act No. 282, Pub. Acts 1939).

15. MUNICIPAL CORPORATIONS—TAXATION OF STATE-OWNED LAND.

A city has no power or authority to levy a special assessment
against land while owned by the State.

Per SHARPE, C. J., and BUSHNELL, BOYLES, and NORTH, JJ.

Mandamus by Municipal Investors Association, a
corporation, to compel City of Birmingham and
others to assess additional taxes on certain lands in
said city in order to pay special assessment bonds.
Submitted April 15, 1941.   (Calendar No. 41,532.)
Writ denied June 30, 1941.   Affirmed by Supreme
Court of the United States April 27, 1942.

*Berry & Stevens* (*Claude H. Stevens,* of counsel),
for plaintiff.

*Miller, Canfield, Paddock & Stone* and *Harry Allen,* for defendants.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Peter E. Bradt,* Assistant Attorney General, for State of Michigan, intervener.

*Voorhies, Long, Ryan & McNair, amici curiae.*

CHANDLER, J.  Plaintiff is the holder of six $1,000 bonds numbered 12 to 17 inclusive, which were issued by the village of Birmingham on October 1, 1928, as part of a series of 14 bonds of like denomination in anticipation of the collection of special assessments to be assessed against special assessment district No. 146, composed of 106 lots to be improved by a street-paving project.  The village of Birmingham reincorporated as the city of Birmingham in 1933, and the city assumed all of the debts and liabilities of the village including these bonds which bore interest at the rate of $5\frac{1}{4}$ per cent. per annum, and matured on October 1st of the year indicated as follows:  $4,000—1929;  $3,000—1930;  $4,000—1931; $3,000—1932; and $3,000—1933.  In addition to the bonds which plaintiff holds, there are yet outstanding 3 of 4 bonds which were issued to refund the obligations maturing in 1931.

The special assessment district consisted of 18 lots in Birmingham Lincoln Lots subdivision and 88 lots in Birmingham Lincoln Lots resubdivision. The sum of $14,388.77, later reduced to $12,436.25, was levied against the resubdivision property, but nothing was ever paid thereon.  An assessment of $3,405.81, later reduced to $2,942.61, was made against the subdivision premises, but payment was made on only 9 and a fraction lots.

A payment of $100 was made upon plaintiff's bonds on June 19, 1939, and upon the refunded obligations on November 28, 1939, leaving a principal amount of $8,100 due and owing, which with accrued interest to January 1, 1941, constitutes an outstanding indebtedness in excess of $11,800. The amount on hand in the assessment fund is $25.67.

All the lots in both subdivisions upon which assessments were levied but not paid were offered for sale at the annual tax sale for the year 1938 and bid in by the State of Michigan. Title passed to the State upon failure of the owners to exercise their right of redemption.

Alleging that no more than $2,000 will be received upon the assessments already made and moneys allocable to the assessment district by reason of the cancellation of special levies under the provisions of Act No. 155, Pub. Acts 1937, as amended (Comp. Laws Supp. 1940, §§ 3723-1 to 3723-14, Stat. Ann. § 7.951 *et seq.*), plaintiff instituted this action for a writ of mandamus to compel defendants to make an additional assessment, a demand for a reassessment of the property in the district in an amount sufficient to pay the principal and interest of the outstanding bonds having been denied by the defendant city commission.

Plaintiff argues that the officials of the city of Birmingham are required by charter to make an additional deficiency levy and that the sale of the property to the State under the general property tax laws and subsequent conveyance by the State under Act No. 155, Pub. Acts 1937, as amended, does not preclude such levy, for such sale affects only existing liens and not additional deficiency liens which were nonexistent at the time of sale. Defendants have assumed that it would have been the duty of the city commission to have levied additional de-

ficiency assessments had there been no tax sale, but vigorously resist this proceeding upon the theory that they have been relieved of such duty and no longer have the power to levy further assessments by reason of the cancellation of taxes and assessments when absolute title to most of the lots in the district vested in the State and did not revive when the lots were repurchased by the former owner in accordance with the terms of Act No. 155, Pub. Acts 1937, subsequently amended by Acts Nos. 29, 244, and 329, Pub. Acts 1939, and the general property tax law * as amended by Acts Nos. 114 and 325, Pub. Acts 1937.

In the recent case of *Baker* v. *State Land Office Board*, 294 Mich. 587, 592–594, Justice McALLISTER described the background giving rise to the enactment of the foregoing statutes:

"Between the years 1920 and 1930 speculative activities in real estate in the State, unrestrained by normal caution and on a scale unparalleled, had resulted in platting subdivisions with building lots sold at highly inflated prices. The same exaggeration seeped into farm lands and business properties in cities. During this period municipalities and their officials encouraged the speculative movement by approval, in undeveloped areas, of widespread improvements, including sewer extensions, sidewalks, and pavements. The entire movement was pervaded by an enthusiasm uncolored by moderation. But all of these plans and hopes collapsed under the pitiless and inexorable advance of economic depression, of which this court has on several occasions taken judicial notice. * * *

"The result of this activity was that taxes on excessively high assessments became delinquent and accumulated in amount until they greatly exceeded the assessed valuation. For approximately six

---

* 1 Comp. Laws 1929, § 3389 *et seq.* (Stat. Ann. § 7.1 *et seq.*).—RE-PORTER.

years subsequent to 1932, no tax sales were held; moratorium statutes were passed by the legislature, embodying waiver of interest and penalty charges and providing for payment of taxes in instalments covering a 10-year period; but such efforts were in vain, and the unpaid taxes accumulated until in some counties they exceeded five times the amount of the assessed valuation of the property. Planning commissions, which occupied themselves with a possible solution of the problem, were appointed by the governor, and concluded that the various plans to remedy the situation had failed to stop the abandonment of tax delinquent land; and legislative committees made exhaustive studies in an effort to devise means of overcoming the rapidly growing peril which was assuming catastrophic form. The result was the enactment of Act No. 155, Pub. Acts 1937, and the amendment of the general property tax law by Acts Nos. 114 and 325, Pub. Acts 1937.''

One cannot but conclude, considering the motivating force behind this legislation, that it was the answer of the legislature to the desperate problem of delinquent taxes based upon property valuation having no foundation in fact, and to clear away the debris left by an abnormally high tide of prosperity swept up by an irresistible current of speculation.

''The primary and inducing purpose of the legislation was to secure a portion of the unpaid taxes, rather than nothing, and to restore lands to a taxpaying basis, instead of supinely allowing them to accumulate tax delinquencies with no hope of ever recovering them.'' *Baker* v. *State Land Office Board, supra,* 606.

Pursuant to legislative intent the Michigan Supreme Court has held that a taxpayer may bring mandamus to compel a city to place on its tax rolls immediately all parcels of land sold under the ''scavenger'' act even though the State land office

board had not as yet executed deeds or contracts to the successful bidder; that such lands are subject to taxation when a bid is accepted and notice of sale given by the agent of the board to the county treasurer who in turn is obliged to notify the proper assessing officers. *Wilson* v. *City of Pontiac,* 294 Mich. 79.

It is remedial legislation and is to be construed as such. *Oakland County Treasurer* v. *Auditor General,* 292 Mich. 58.

"In interpreting the act our duty is to ascertain the meaning of the statute, to give it full force and effect, coloring our construction by the purpose of its enactment. The statute is remedial and is entitled to a liberal construction. * * * It is said to be the duty of the court to draw inferences from the evident intent of the legislature, as gathered from a view of the law in its entirety; we must render effectual the specific things which are included in the broad and comprehensive items and purposes of the law." *Wilson* v. *City of Pontiac, supra,* 86.

Plaintiff says that the additional assessment sought in this case has not yet been levied against the premises and therefore was not a lien when the State acquired title pursuant to the terms of the general tax laws, and hence was not extinguished. A contrary holding, argues plaintiff, would result in the impairment of contractual obligations. In the *Baker Case, supra,* it was claimed that there was nothing in the title of the general property tax law as amended by Act No. 114, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 3459, Stat. Ann. 1940 Cum. Supp. § 7.112),* to indicate that it covered the cancella-

---

* See, also, Comp. Laws Supp. 1940, § 3459-1, Stat. Ann. 1940 Cum. Supp. § 7.112(1).—REPORTER.

tion of past as well as future taxes and special assessments, or that municipalities which have borrowed in anticipation of the collection of taxes or issued special assessment bonds shall have such taxes and assessments cancelled. A review of the briefs filed in the *Baker Case* shows that counsel for plaintiff herein filed a brief *amicus curiae* in which many of the cases relied upon by plaintiff in the instant suit were cited. Notwithstanding the fact that the court had those cases before it, the argument made was repudiated upon the ground that it was unnecessary to include in the title the nature of the interest secured by the purchaser upon the sale, as well as the specific tax incumbrances from which the property was freed in such proceedings, and the court concluded that the statutes in question do not contravene the requirements of the State or Federal Constitution forbidding the impairment of the obligations of contract.*

"It is claimed that the statute destroys vested rights of municipalities to tax liens and assessments already assessed and levied, and destroys property and contract rights of individuals who have purchased bonds under the assumption of their payment through collection of the very taxes and assessments which the act cancels. In addition to our determination as above expressed, it can be said that such purchasers can be assumed to have purchased with knowledge that the lien upon the property securing such taxes and assessments might be displaced." *Baker* v. *State Land Office Board, supra,* 599.

That act, passed the same year as Act No. 155, Pub. Acts 1937, amended section 67 of Act No. 206, Pub. Acts 1893 (1 Comp. Laws 1929, § 3459), and added the following significant language to the

---

* See U. S. Const. art. 1, § 10; Mich. Const. 1908, art. 2, § 9.—REPORTER.

decree to be entered upon the sale of property for tax delinquencies:

" 'It is further ordered, adjudged and decreed that title to each parcel of land ordered in this decree to be offered for sale, and which parcel of land is bid in at such sale to the State, shall become absolute in the State of Michigan on the expiration of the period of redemption from such sale, and all taxes and other liens and incumbrances, of whatever kind or nature * * * cancelled as of such date. * * *;

"Upon the entering of the decree hereinbefore provided for, absolute title to the lands therein shall vest in the State of Michigan as provided in said decree."

Act No. 155, § 9, Pub. Acts 1937, defining the authority of the State land office board to execute deeds and conveyances, reads in part as follows:

"Any quitclaim deed or deeds executed by the board shall convey title in fee to land vested in the board under the provisions of this act, free from any incumbrances, except as herein otherwise provided."

The exception referred to is not pertinent to this discussion.

Act No. 244, Pub. Acts 1939, which amended Act No. 155, § 10, Pub. Acts 1937, provides for the division of the receipt of moneys by the State land office board "in proportion to the delinquent taxes and special assessments of such units cancelled against any description of land sold under the provisions of this act, by the board, any county treasurer or the department of conservation," and refers to the title acquired by the State in these words:

"Such cancelled taxes and special assessments shall be deemed to include all taxes and assessments

levied or becoming liens against said lands prior to the vesting of title in the State of Michigan.''

The clear import of the language of the foregoing amendatory enactments, and the obvious intent and purpose of the legislature to relieve owners from the weight of accumulated obligation, *James A. Welch Co., Inc.,* v. *State Land Office Board,* 295 Mich. 85, must lead one to the conclusion that when title to the lots here in question became absolute in the State of Michigan upon expiration of the period of redemption provided by the tax law free of all taxes and other liens and incumbrances of whatever kind or nature, and future and deficiency as well as past assessments and taxes were cancelled. To hold otherwise would defeat the purpose of this remedial legislation by a narrow and unwarranted construction, and would once again give rise to the vicious circle of assessment based upon inflated valuation; refusal or inability of the owner to pay; followed by a sale of the premises pursuant to the State's sovereign power of enforcing the collection of taxes.

It should be borne in mind that when the lots in question were sold for delinquencies, upon failure to redeem, the title vested absolutely in the State with power to dispose of them in any way not contrary to the Constitution. Upon resale by the State land office board, a new chain of title originated, evidenced by a quitclaim deed, ''free of any incumbrances.''

Said Justice COOLEY in the early case of *Sinclair* v. *Learned,* 51 Mich. 335, 344:

''Every sale of lands under our tax system is a sale of the complete title; and if legal, all prior titles are cut off by it.''

In the more recent case of *Krench* v. *State of Michigan,* 277 Mich. 168, 179, it is stated:

"The State held title in fee simple. The original title had come to an end and a new chain of title originated with the State. The deed to Lucinda Turner was no part of any statutory proceedings instituted for the purpose of foreclosing the interest of an original owner who had become delinquent in the payment of taxes. This should be kept in mind for it notes the distinction between sales calculated to cut off former ownership and that of vested ownership in the State. In the one instance the statute divests title in one and vests it in another through tax foreclosure proceedings, while in the other a new title originates by deed from the State. The State, having title in fee, could like any other owner in fee, deed with reservation of oil, gas and minerals. It needed no amendment to an inapplicable statute to enable the State, by legislative enactment, to establish a policy with reference to land owned by the State in fee. The deed to Lucinda Turner was not a tax sale deed but one upon bargain, with sale by the State, the owner in fee of the land, and such owner could and did sever the divisible fees."

The rule is reiterated in *Rathbun* v. *State of Michigan*, 284 Mich. 521, 539, in these words:

"By the foregoing provisions there can be no doubt that after the period for redemption of property bid off to the State for delinquent taxes, the State receives the absolute title to such lands, and in the instant case the State owned the absolute title to the lands in controversy prior to any of the transactions with J. F. Rathbun."

"Inasmuch as the State is the absolute owner of the lands, the legislature is empowered to provide for the sale thereof in any way not prohibited by the Constitution." *Baker* v. *State Land Office Board, supra,* 602.

See, also, *Hoffman* v. *Otto*, 277 Mich. 437.

The legislative body of the State has determined in what manner lands owned by the State shall be sold. In a long and able opinion to which reference has been made the constitutionality of this legislation was upheld, and having determined that the right to make any further special deficiency assessments as well as actual assessments made are totally and completely extinguished and cancelled, it follows that petitioner's demand for a writ of mandamus should be and is denied.

No costs awarded, a public question being involved.

SHARPE, C. J., and BUSHNELL, BOYLES, NORTH, and WIEST, JJ., concurred with CHANDLER, J.

SHARPE, C. J. I concur in the result reached by Mr. Justice CHANDLER. The paramount question involved in this case may be stated as follows: Do the statutes here involved prevent reassessment on special assessment districts when the land in such districts has been bid in by the State at the tax sale and then resold under the so-called scavenger act?[*]

Act No. 206, § 67, Pub. Acts 1893, as last amended by Act No. 282, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 3459, Stat. Ann. 1940 Cum. Supp. § 7.112), dealing with the decree to be entered upon the sale of property for tax delinquencies, provides:

" 'It is further ordered, adjudged and decreed that title to each parcel of land ordered in this decree to be offered for sale, and which parcel of land is bid in at such sale to the State, shall become absolute in the State of Michigan on the expiration of the period of redemption from such sale, *and all*

[*] Act No. 155, Pub. Acts 1937, as amended (Comp. Laws Supp. 1940, §§ 3723-1 *et seq.*, Stat. Ann. 1940 Cum. Supp. § 7.951 *et seq.*).— REPORTER.

*taxes and other liens and incumbrances, of whatever kind or nature,* cancelled as of such date.' * * *

"Upon the entering of the decree hereinbefore provided for, absolute title to the lands therein shall vest in the State of Michigan as provided in said decree."

Act No. 155, § 9, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 3723-9, Stat. Ann. 1940 Cum. Supp. § 7.959), defining the authority of the State land office board to execute deeds and conveyances, reads as follows:

"Any quitclaim deed or deeds executed by the board shall convey title in fee to land vested in the board under the provisions of this act, *free from any incumbrances.*"

Under the above authority, when the land is sold to the State for tax delinquencies, all incumbrances upon the land are discharged; and under the scavenger act, such land owned by the State is sold by it free of all incumbrances. Is the liability to reassessment an incumbrance within the meaning of these statutes? It is the general rule that a special assessment does not become an incumbrance until it has become a lien against the premises. See 72 A. L. R. 302; *Jaques* v. *Tomb,* 179 Calif. 444 (177 Pac. 280); *Cemansky* v. *Fitch,* 121 Iowa, 186 (96 N. W. 754); *Metropolitan Life Ins. Co.* v. *Union Trust Co.,* 283 N. Y. 33 (27 N. E. [2d] 225, 128 A. L. R. 370); *Lindsay* v. *Eastwood,* 72 Mich. 336.

In *Post* v. *Campau,* 42 Mich. 90, we said:

"Anything is an incumbrance which constitutes a burden upon the title; a right of way, *Clark* v. *Swift,* 3 Metc. (44 Mass.) 390, 392; a condition which may work a forfeiture of the estate, *Jenks* v. *Ward,* 4 Metc. (45 Mass.) 404, 412; a right to take off tim-

ber, *Cathcart* v. *Bowman,* 5 Pa. 317; a right of dower, whether assigned or unassigned, *Runnells* v. *Webber,* 59 Me. 488. In short, 'every right to, or interest in the land, to the diminution of the value of the land, but consistent with the passage of the fee by the conveyance.' *Prescott* v. *Trueman,* 4 Mass. 627, 630 (3 Am. Dec. 246)."

Under the above definition of an incumbrance, it would naturally follow that the possibility of reassessment would constitute an incumbrance and thus be cancelled. Moreover, the city of Birmingham has no power or authority to levy a special assessment against the land while it is owned by the State of Michigan.

In *People, ex rel. Auditor General,* v. *Ingalls,* 238 Mich. 423, 425, we said:

"The doctrine has been pretty well settled in this State and elsewhere that property owned by the State or by the United States is not subject to taxation unless so provided by positive legislation. And municipalities and State agencies are included in this class when their property is used for public purposes. The reason which supports this doctrine is that, if taxes were permitted to be levied against the sovereign, it would be necessary to tax itself in order to raise money to pay over to itself. This would be an idle thing to do. And, besides, it is rather incongruous that the creature should have the right to tax its creator without its consent. Out of this reason has grown an implied presumption that the State is exempt from all taxes unless the one asserting it can point to some legislation in support of it. We are not aware of any law, nor has any been called to our attention, which authorizes the city of Detroit to levy any tax or assessment against State property. Unless it can do this, its contention must fail. Again, if this tax can be levied against

State property, who has authority to pay the tax, and, if it is not paid, who has authority to sell the land to pay the tax?"

The writ is denied.

BUSHNELL, BOYLES, and NORTH, JJ., concurred with SHARPE, C. J. BUTZEL, J., did not sit. MCALLISTER, J., took no part in this decision.