COOPER v. KOVAN.

1. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW.
   The Supreme Court hears a chancery appeal on the record *de novo*,
   but gives great weight to findings of fact by the trial court.

2. COVENANTS—RESIDENTIAL BUILDING RESTRICTIONS—FINDINGS OF
   TRIAL COURT.
   Finding of trial court who viewed premises involved in suit to
   enforce building restrictions that such property was subject
   to residential building restrictions, that such restrictions were
   clear and unambiguous, that action taken by the zoning
   board of appeals had not changed or invalidated the restric-
   tions, and that the subdivision owners had not abandoned them
   or waived their right to enforce them *held*, supported by record
   presented on appeal.

3. SAME—STATE LAND OFFICE BOARD—RESTRICTIONS.
   The State land office board was empowered to execute agreements
   in 1944 to establish, extend, amend, alter or set aside restric-
   tions upon land to which the State had acquired title under
   the act establishing the board (CL 1948, § 211.359).

4. SAME—INTENT—ISOLATED SENSELESS PHRASES—OMISSIONS.
   A court must give effect to restrictions upon land that are
   imposed by a valid instrument, insofar as the intention of the
   parties is clearly ascertainable, the fact that there is an isolated
   senseless phrase or clause or some phrase that indicates an
   omission not vitiating the whole instrument, if the general plan
   and intention of the parties is otherwise unmistakable.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error §§ 814, 815.
[2] 14 Am Jur, Covenants, Conditions and Restrictions § 34 *et seq.*
[3] 14 Am Jur, Covenants, Conditions and Restrictions § 215.
[4, 5] 14 Am Jur, Covenants, Conditions and Restrictions § 210 *et
   seq.*
[7] 14 Am Jur, Covenants, Conditions and Restrictions §§ 294, 295.
[9] 14 Am Jur, Covenants, Conditions and Restrictions § 194.
[10] 14 Am Jur, Covenants, Conditions and Restrictions §§ 302, 305.
[11] 14 Am Jur, Covenants, Conditions and Restrictions § 299.

5. SAME—EXCEPTED LOTS—INTENT.

Recorded instrument which contains an obvious error or omission with respect to certain lots not involved in suit to enforce residential building restrictions but, so far as land .involved in suit is concerned, plainly and clearly stated restrictions which have been followed up to date, must be enforced by court duly presented with bill for such purpose.

6. SAME—SUBSEQUENT RESTRICTIVE- AGREEMENT—LOTS NOT COVERED.

Fact that 3 of 482 lots in subdivision were not covered by restrictive agreement entered into when State had title to most lots under State land office board act some years after land had been subdivided did not make the agreement void, where it appears that 2 of such 3 lots were owned by parties who had signed the agreement and 'the' remaining lot was separately restricted by deed.

7. SAME—RESTRICTIONS—WAIVER—ABANDONMENT.

Finding of trial court that residential restrictions that were imposed upon land involved in 1944 had not been waived or abandoned by plaintiffs who purchased their lots in 1946 *held,* supported by record showing that no permanent structures other than residences had been erected· on the premises and that the only nonresidential use made of it was either sporadic or infrequerit overflow noncommercial parking or related to a nonconforming use now discontinued.

8. SAME—GREEN BELT—COURTS.

The power to provide a buffer strip or green belt of residences or lawn between objectors' residences and a proposed shopping center, in accordance with present-day city planning principles, is not in judicial hands, where to do so violates validly imposed residential restrictions that have not been waived or abandoned and conditions since imposition have not been changed.

9. PROPERTY—RESIDENTIAL RESTRICTIONS.

Residential restrictions generally constitute a property right of distinct worth.

10. COVENANTS—INJUNCTION—CHANGED CONDITIONS.

Equity will not enjoin the violation of restrictions if the purpose for which they were imposed can no longer be accomplished because of changed conditions.

11. SAME—CHANGE OF ZONING.

A change in zoning does not of itself justify the invalidation of building restrictions.

Appeal from Macomb; Spier (James E.), J. Submitted October 2, 1956. (Docket No. 16, Calendar No. 46,852.) Decided September 4, 1957.

Bill by Frank E. Cooper and other landowners against Flora Kovan, Samuel Kutzen, Ann Kutzen and others to enforce residential building restrictions. Decree determining certain areas as residential and permitting use of remainder of land for business and parking purposes under certain conditions. Plaintiffs appeal. Defendants cross-appeal. Reversed and remanded for entry of decree ordering land maintained as residential.

*McGraw, Lynch, McInally & Ferguson,* for plaintiffs.

*David M. Miro,* for defendants.

EDWARDS, J. The plaintiffs in this instance are residential property owners in the Michael and John Sprenger subdivision in the immediate vicinity of the property formerly occupied by Eastwood Park. This major amusement center was operated from the 1920's down to recent years on the unsubdivided northeast corner of Eight Mile road and Gratiot avenue. Immediately adjacent to the unsubdivided and unrestricted plot upon which Eastwood Park buildings were constructed, lay approximately 3-1/2 subdivided blocks of vacant land containing 82 lots which, during all of the latter years of the park's operation, were owned by the owners of the park property and had (to a disputed degree and somewhat sporadically) been used in conjunction therewith for such things as picnicking, fireworks, and, more usually, parking.

These 3-1/2 blocks had been platted in 1924 as a part of the Sprenger subdivision. They are shown

on plaintiffs' exhibit 3 and may be referred to as "the disputed area." Thereafter, in the 1920's and again in 1944, 2 separate attempts to restrict these blocks to residential use were made. The legal effect of both purported restrictions is hotly disputed in this suit. The chronology of crucial events leading up to this suit is shown as follows:

1924—Michael and John Sprenger subdivision platted, encompassing 482 lots. Some were later taken for highway expansion.

1926 to 1930—Original plattors executed 18 deeds containing certain restrictive provisions.

1939—(November 29th) Practically all the lots now owned by plaintiffs and defendants reverted to the State of Michigan for nonpayment of taxes.

1944—(March 22d) While the State still held title to these lots, the land office board and the owners and land contract purchasers executed the controversial exhibit 37(a) restricting the subdivision to residential use. Three lots were not covered.

1944—(March 28th) Exhibit 37(a) recorded in Macomb county, Liber 548, pp 83–89.

1954—(December 13th) Disputed area rezoned from "residential" to "business and parking."

About 1950 lengthy litigation pertaining to the operation of Eastwood Park resulted in termination of its operation. *Eastwood Park Amusement Co.* v. *Mayor of East Detroit,* 325 Mich 60.

Subsequent to the termination of the operation of Eastwood Park, the owners of the park property and the 3-1/2 blocks in question sought a permit from the board of zoning appeals of the city of East Detroit for the use of these 3-1/2 blocks in the construction of a major shopping center. According to the developers' plans, the buildings of the shopping center would extend well into the 3-1/2 blocks in

question and the balance thereof would have been allocated to off-street parking.

Plaintiffs in the instant litigation filed their bill of complaint to seek the aid of a court in chancery to restrain the defendants from violating the residential restrictions upon this property which plaintiffs contend are still in force and effect. They rely, first, upon the terms of the 18 deeds executed in the 1926 to 1930 period by the original grantors and containing the following language:

"Nothing but a single dwelling costing not less than $5,000 or a multiple dwelling costing not less than $7,000 shall be erected on any lots situated between Gratiot and Elizabeth avenues except those fronting on Gratiot and Ego boulevard."

The disputed area of this proceeding lies within the described boundaries.

In the alternative, plaintiffs rely upon exhibit 37(a) in the execution of which the original grantors, certain contract purchasers of most of the lots now in dispute, and the State of Michigan, through its land office board, all joined—the latter after title to practically all of the lots reverted to the State for nonpayment of taxes in 1939.

"(a) All lots in the tract shall be known and described as residential lots, except lots 1 to 6, 9 to 21, inc., 24 to 37, inc., 40 to 55, inc., 58 to 67, inc., in Assessor's Sprenger State Sub. residential, religious may be used for educational or business purposes. No structure shall be erected, altered, placed, or permitted to remain on any residential building plot other than 1 detached single-family dwelling or 1 semi-detached single-family dwelling not to exceed 2 stories in height and a private garage for not more than 2 cars."

As will be readily noted, the ambiguity of the words following "Assessor's Sprenger State Sub." provide still another issue.

The judge who heard this equity action was confronted by these issues pertaining to the claimed restrictions:

(1) Did the 18 deeds executed by original plattors between 1926 and 1930 create negative reciprocal easements that would be binding upon subsequent purchasers?

(2) Did reversion of title to the State in 1939 eradicate those restrictions?

(3) Did the covenant of 1944 serve to create effective restrictive easements?

a. Did the State land office board have authority to execute this agreement?

b. Was the agreement too ambiguous to be enforced against defendants' 82 lots?

(4) Did the testimony at hearing warrant a finding that plaintiffs had abandoned the restrictions?

(5) Did the testimony at hearing indicate such a change of circumstances as to warrant a court in equity to decline to enforce the restrictions?

Judge Spier, in a long and careful opinion, found for the plaintiffs on all of the legal issues raised. He found that the property in question was subject to residential restrictions; that the restrictions were clear and unambiguous; that the action of the zoning appeals board did not change or invalidate the restrictions; that the subdivision owners had not abandoned them or waived their right to enforce them. Finally, however, Judge Spier took a long look back at the history of this property, and an equally long look forward at the nature of the improvement planned, and held, in effect, that it was within the power of a court of equity to effect a compromise. This he accomplished by issuing a limited injunction against the defendants restraining them from using the easternmost 130 feet of the disputed property for anything except a green belt, and the next easternmost 100 feet of the disputed property

for anything other than parking, and thereupon gave them free rein to proceed on the balance of the disputed property (and, of course, the unsubdivided property) to erect their shopping center. His decision has the peculiar merit of having left both sides completely dissatisfied, resulting in plaintiffs' appeal and defendants' cross-appeal.

On appeal of a chancery decree we hear the matter on the record *de novo*. But we give great weight to the chancellor's findings of fact. *Hartka* v. *Hartka,* 346 Mich 453; *Donaldson* v. *Donaldson,* 134 Mich 289. We note in this case the care with which the chancellor approached the factual dispute. We particularly approve in this building restriction dispute his personal viewing of the premises. After reviewing the record we find occasion to express entire approval of his view of the facts. We will subsequently be concerned with the application to those facts of various legal principles.

We find no need to pass on the effect of the restrictive provisions of the 18 deeds executed in the 1920's. On review of this record and the exhibits, we agree with the judge who heard the matter that the covenant of 1944 created restrictions which are applicable to the disputed property. The State land office board joined in the execution of these restrictions as it was empowered to do.

"Conveyances made by the State land office board or department of conservation to any purchaser shall be subject to any existing restrictions as to improvements and use of the property conveyed: Provided, however, That the board or department in behalf of the State of Michigan may execute any agreements establishing, extending, amending, altering, or setting aside any such restrictions." CL 1948, § 211.359 (Stat Ann 1950 Rev § 7.959).

See, also, *Municipal Investors Ass'n* v. *City of Birmingham*, 298 Mich 314; *Young* v. *Thendara, Inc.*, 328 Mich 42.

We likewise agree with the chancellor that the language of the restrictions applicable to the lots currently in dispute was clear and unambiguous:

"The court must give effect to the instrument as a whole where the intention of the parties is clearly ascertainable. The fact that an isolated senseless phrase or clause may appear, or a phrase may appear in the instrument that clearly indicates some omission, would not necessarily vitiate the whole instrument if the general plan and intention of the parties is otherwise unmistakable."

The restrictions read:

"All lots in the tract shall be known and described as residential lots, except lots 1 to 6, 9 to 21, inc., 24 to 37, inc., 40 to 55, inc., 58 to 67, inc., in Assessor's Sprenger State Sub. residential, religious may be used for educational or business purposes. No structures shall be erected, altered, placed, or permitted to remain on any residential building plot other than 1 detached single-family dwelling or 1 semi-detached single-family dwelling not to exceed 2 stories in height and a private garage for not more than 2 cars."

It will be observed from inspection of the above that the obvious error of omission or transposition pertains only to the lots excepted which, on reference to plaintiffs' exhibit 31, we find to be lots facing Gratiot avenue and not a part of the property in dispute herein.

Taking the document as a whole, by plain intent and clear statement, it constitutes a detailed residential restriction both as to the balance of the Sprenger subdivision and as to the property with which we are currently concerned. It is obvious from this record that the general plan of the restric-

tions has been followed up to date. We do not feel under these circumstances that we have an ambiguous restriction to interpret, or that the cases cited by defendants pertaining to the resolution of doubts in favor of free use of the property are in point. *Bastendorf* v. *Arndt,* 290 Mich 423 (124 ALR 445); *Moore* v. *Kimball,* 291 Mich 455.

Nor are we impressed by defendants' contention that the failure of 3 lot owners to sign the restrictive agreement voided it. It appears that 2 of the lots were owned by Sprengers who did sign, and that the other lot was itself specifically though separately restricted by deed.

The next issue to be dealt with pertains to defendants' claim that plaintiffs have waived and abandoned the restrictions. After reviewing the testimony and noting that defendants make no claim of erection of any permanent type structure on the disputed property, we feel that we cannot improve upon the findings and opinion of the chancellor, who heard the evidence and passed on the claimed use of the disputed area, thus:

"In 1930 some of the activities started spreading into the disputed area. It would seem fairly well established, however, that the use of this disputed area, or subdivision lots, consisted of fireworks on specific occasions a number of times a year up until 1948, after which this particular use was ceased because of the danger to the residences which had then grown up in the surrounding area.

. "Also various organizations and unions would hold annual picnics in the disputed area. The roads and vacant lots would be used for parking purposes on occasions when the parking facilities otherwise furnished were overflowing. One entire block of lots (404–418) in the disputed area were cinderized and lighted with signs designating the parking area. This latter parking block was maintained for a number of years and right up to the time the park closed.

"At various picnics and outings, baseball games would be held on the disputed area and at one time the backstop for such games was maintained. There were occasions, not definitely testified to as to date, when temporary soft drink stands would be placed in this disputed area for the service of such picnics and outings.

"After the city refused to renew the Eastwood Park license, the amusement park, as such, was discontinued in 1950. However, a roller rink remained in operation and the large dance hall or ballroom was frequently leased up until 1953, at which time all of the remaining buildings, structures, and swimming pool were removed, and both the commercial block and the disputed area have remained vacant lands, except for a 'revival meeting' tent one summer.

"At no time were any permanent structures erected in the disputed area. It should also be borne in mind that the plaintiffs did not purchase their property nor erect their homes until 1946 and after.

"The plaintiffs have not been guilty of laches. There has been no 'acceptance' of nor 'acquiescence' in any commercial structures. The disputed area has been vacant and overgrown with weeds since plaintiffs have acquired their interest, with only occasional overflow parking on infrequent occasions since 1950. There was nothing on or about the disputed area, at the time plaintiffs built, to put them on notice of any restriction violations, or to call for action on their part, except the cinderized parking strip (lots 404-418).

"Intermittent noncommercial parking, not involving any structures or buildings of any kind, is in no way comparable to the erection of business buildings and the carrying on a permanent business thereon, and is not a waiver of residential restrictions. *Scott* v. *Armstrong*, 330 Mich 504 at 517. Citing *Polk Manor Co.* v. *Manton*, 274 Mich 539; *Carey* v. *Lauhoff*, 301 Mich 168; *Boston-Edison Protective Ass'n* v. *Goodlove*, 248 Mich 625."

Having thus resolved all legal issues in favor of the plaintiffs, Judge Spier then entered a decree of a most interesting nature under that portion of his opinion headed "Equitable Considerations." Apparently seeking a compromise between 2 hostile forces the judge entered an injunction restraining defendants from using the first 130 feet of their land lying west of Crusade for anything other than residence or "green belt" purposes. He then provided by injunction that the next 100 feet to the west should be restricted to parking. Finally, he left defendants free of any injunction as to the balance of "the disputed area."

The obvious purpose, of course, was to provide a buffer strip or green belt of residences or lawn between plaintiffs and the proposed shopping center, in accordance with present-day city planning principles. Desirable as such a plan may be in general city planning terms, we must answer the question here as to whether the circuit judge sitting in equity had power to effect such a compromise in the face of and at the expense of existing and valid residential restrictions, or whether such planning must be left to planning boards and private developers.

We are unable to find that this power lies in judicial hands. As equitable exceptions to the general rule that the courts will enforce valid restrictions by injunction we find these: (a) Technical violations and absence of substantial injury; (b) Changed conditions; (c) Limitations and laches. 26 CJS, Deeds, § 171.

The violation contemplated here is far from technical and we cannot hold from the facts recited that the injury feared would be unsubstantial. The conversion of a large portion of a residential subdivision to business in direct violation of a contrary covenant undoubtedly affects every home therein. Home owners seek, by purchasing in areas restrict-

ed to residential building, freedom from noise and traffic which are characteristic of business areas. How much in dollars the peace and quiet of this neighborhood is worth, or how much the contemplated major business invasion would diminish that value, would be hard to establish. But it is clear in our mind that residential restrictions generally constitute a property right of distinct worth.

The court below found no invalidation of the restrictions by laches or by waiver, and we concur.

The remaining question is: Did changed conditions justify the court in withholding the enforcement of these restrictions by injunction?

We believe the fairest statement of the equitable considerations which might move a court to withhold enforcement of residential restrictions due to changed conditions is found in 7 Thompson on Real Property (Perm ed), § 3651, pp 141, 142, as follows:

"If the purpose for which restrictions were imposed can no longer be accomplished, equity will not enjoin their violation. Thus, if the purpose of restrictions was to make and preserve the locality for residences only, and the condition of the locality has greatly changed through the growth of the city, and that part of the city has come to be used chiefly for business purposes instead of residences, and it would be impossible to restore the residential character of the neighborhood by the enforcement of the restrictions upon the land to which they apply, it would be inequitable and oppressive to give effect to the restrictions. In such a case a court of equity will not enforce the restrictions, but will leave the parties to their remedy at law."

In comparing our current problem with this standard, we note as major facts that the restrictions date back only to 1944; that the housing in the subdivision has all been constructed since 1946; and that the record discloses that the residential restrictions here

considered have not been violated in one instance by the erection of a nonresidential building either within or without "the disputed area."

Defendants, in arguing for complete freedom from the restrictions, and the judge in stating his reasons for his compromise plan, refer to

(1) The high volume of traffic on the arterial highways nearby;

(2) The residential growth in the general area and the consequent increased demand for business property;

(3) The relative desirability of a well-planned shopping center with off-street parking;

(4) The use of "the disputed area" by the amusement park for overflow parking and picnicking;

(5) The rezoning of "the disputed area" for business and parking.

The first 3 factors listed are so generally applicable in big city suburbs that to justify abrogation of the instant restrictions on these grounds would place all residential restrictions in substantial jeopardy.

A change in zoning does not of itself justify invalidation of building restrictions. *Abrams* v. *Shuger*, 336 Mich 59; *City of Lansing* v. *Dawley*, 247 Mich 394.

We have already noted that the record did not disclose business use of "the disputed area" of a character sufficient to invoke the doctrine of laches against plaintiffs. Nor do these facts meet the test of changed conditions laid down in Michigan case law or in the law of other jurisdictions. *Redfern Lawns Civic Ass'n* v. *Currie Pontiac Co.*, 328 Mich 463; *Carey* v. *Lauhoff*, 301 Mich 168; *Boston-Edison Protective Ass'n* v. *Goodlove*, 248 Mich 625; *French* v. *White Star Refining Co.*, 229 Mich 474; 26 CJS, Deeds, § 171; 43 CJS, Injunctions, § 87; 14 Am Jur, Covenants, Conditions and Restrictions, § 305.

The chancellor below apparently relied upon a similarity of facts and some language concerning the equities contained in the *Redfern Lawns Civic Ass'n Case, supra.* We agree that there were some similarities. But we note that the court ultimately held that the restrictions should be enforced.

We hold the instant residential restrictions valid and enforceable as to the property in dispute in this suit. The decree will be set aside and the cause remanded for entry of a decree in conformity with this opinion. Costs to appellants.

DETHMERS, C. J., and SHARPE, SMITH, KELLY, CARR, and BLACK, JJ., concurred.

VOELKER, J., took no part in the decision of this case.