## MORGAN *v.* MATHESON.

1. COVENANTS—RACIAL INTEGRATION—RESIDENCE USE.
   Racial integration of a subdivision has no bearing upon the legal rights of property owners to enforce residential restrictions.

2. SAME—CHANGE IN USE OF SURROUNDING AREA.
   A change in use in the area surrounding a subdivision does not affect the legal rights of property owners to enforce residential restrictions.

3. SAME—CHANGE IN ZONING.
   A change in zoning does not override restrictions placed in deeds.

4. SAME—SINGLE DWELLING HOUSE—ABANDONMENT AGAINST RESTRICTIONS FOR ROOMING HOUSE USE.
   Use of substantial number of homes as rooming houses in subdivision restricted to single dwelling house use, *held,* to have effected an abandonment of the restriction against usage for rooming house purposes, a use that is inconsistent with the single dwelling house restriction.

5. SAME—CUSTOMER PARKING LOT—RESIDENCE USE.
   The use of land as a customer parking lot for a supermarket is an ordinary commercial use and not consistent with even a multiple-residence restriction.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 14 Am Jur, Covenants, Conditions and Restrictions § 252.
 Restrictive covenants, conditions, or agreements in respect of real property discriminating against persons on account of race, color, or religion. 3 ALR2d 466.
[2] 14 Am Jur, Covenants, Conditions and Restrictions §§ 302, 307.
 Change of neighborhood in restricted district as affecting restrictive covenant. 4 ALR2d 1111.
[3] 14 Am Jur, Covenants, Conditions and Restrictions § 299.
[4, 6] 14 Am Jur, Covenants, Conditions and Restrictions § 294.
[5, 8] 14 Am Jur, Covenants, Conditions and Restrictions § 250 (Supp).
 Use of premises for parking place as a violation of restrictive covenant. 132 ALR 288.
[7] 14 Am Jur, Covenants, Conditions and Restrictions § 199.
[9] 14 Am Jur, Covenants, Conditions and Restrictions §§ 337, 338.

6. SAME—PARTIAL ABANDONMENT.
   A restrictive covenant which has not been abandoned altogether but of which a material and beneficial part remains that has been uniformly observed will be protected.

7. SAME—RECIPROCAL NEGATIVE EASEMENTS—INJUNCTION.
   Restrictions are, in nature, reciprocal negative easements, and while they remain beneficial to the dominant estate, material violations of them will be enjoined to the extent that they remain beneficial.

8. SAME — ROOMING HOUSE — COMMERCIAL PARKING LOT USE — ESTOPPEL.
   Rooming-house violations of single dwelling house subdivisionwide restriction do not estop property owners from enforcing a residential restriction against a commercial parking lot use.

9. SAME—RESIDENCE RESTRICTION—COMMERCIAL PARKING USE—ESTOPPEL—INJUNCTION.
   Restriction to single dwelling house use on subdivision 3 blocks long and containing 98 lots upon only 3 of which have occurred permanent violations, 2 of which were on lots facing a street that was devoted solely to commercial uses and third was for a small flower shop that had not been objected to, *held*, not to have altered basic character of the subdivision so as to estop plaintiff property owners from enjoining use of lots adjoining the present violations from use for commercial parking lot purposes incident to occupation of a supermarket.

10. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW—INJUNCTION—REVERSAL OF DECREE.
    The Supreme Court hears equity suits *de novo* on the record and gives trial court's findings of fact great weight, but will reverse decree dismissing bill for injunction against violation of residence restrictions, where basic character of the subdivision has not been altered.

Appeal from Wayne; Weideman (Carl M.), J. Submitted October 11, 1960. (Docket No. 56, Calendar No. 48,657.) Decided March 1, 1961. Rehearing denied April 26, 1961.

Bill by Henry S. Morgan, Mary M. Grix, and Catherine Morgan against Elinore Louise Matheson, Muriel Constance Matheson, and others to enjoin use of residentially restricted property for com-

mercial parking lot purposes. Bill dismissed. Plaintiffs appeal. Reversed and remanded.

*Piggins, Rehn, Balmer, Grigsby & Skillman,* for plaintiffs.

*Walter M. Nelson,* for defendants Hector A. Johnson and Senia A. Johnson.

*Goldsmith & Rosen,* for defendant Clare W. Forbes.

*Birnkrant, Birnkrant & Birnkrant* (*Wilcox, Lacy, Lawson, Kirkby & Hoffman,* of counsel), for defendants Jacob Holskin and Ethel M. Verlee.

*Weiswasser, Jaffe & Grant* (*Aaron Weiswasser,* of counsel), for defendants Matheson.

EDWARDS, J. In this equity action plaintiffs, residential property owners, sought injunctive relief to enforce a subdivision residential restriction against defendants to keep them from constructing 2 commercial parking lots. After taking extensive testimony, the circuit judge denied the relief sought, principally on the ground that the restrictions had been abandoned. Plaintiffs appeal.

The DeWitt H. Taylor subdivision was platted in 1907. It extended west from Woodward avenue on both sides of Taylor avenue for a distance of 3 blocks, terminating at Hamilton (now John C. Lodge expressway). It encompassed 98 lots, all of which were made subject to the following restrictive covenant:

"That there shall be nothing but a single dwelling house at least 2 stories in height and necessary outbuildings erected on said lot. The front line of such house shall not be less than 25 feet from the front line of said lot. That no fence or other obstruction

to the view except trees shall be placed in front of the building line and that the grade from the line of the sidewalk to said building line shall be 6 inches to every 10 feet.

"That the buildings now or hereafter erected on said lot shall be used only for ordinary and usual purposes of a residence and not otherwise."

The subdivision developed as a fine residential area, with large 2-story homes. After some years, influences of big-city blight began to affect it. Hamilton and Woodward avenues, on each end of the subdivision, became busy commercial streets. The street immediately north of Taylor, Clairmount, acquired a streetcar line in 1927 and deteriorated in property value.

In 1935 the owner of lot 98, on the southwest corner of Taylor and Woodward, leased the lot for construction of a gasoline station fronting on Woodward. The Taylor Avenue Improvement Association sought an injunction because of the violation of the building restriction and this Court, in *Taylor Avenue Improvement Association* v. *Detroit Trust Co.*, 283 Mich 304, permitted, upon certain conditions, the use of the lot for such commercial purpose, holding that the lot, due to changed conditions at the Woodward intersection, could not be developed residentially and that no damage would result to the subdivision from the gasoline station.

Subsequently, in 1947, lot 1 immediately across Taylor, also fronting on Woodward, was developed with a commercial building originally used as an automobile dealership. This time there was no litigation, the situation being a close parallel to that prevailing as to lot 98.

Down to the start of this litigation, no other permanent commercial uses are shown in the subdivision except for the fact that for many years a flower shop fronting on Second avenue has occupied the rear

portion of lot 86. No protest as to this use is shown in this record.

By 1939 other significant changes had taken place. Several of the homes by then were taking in roomers, apparently without any objection by any subdivision property owners.

This practice expanded even after the subdivision was zoned R1. In 1957 the city of Detroit sought to enforce the R1 provisions prohibiting rooming houses in the Taylor subdivision, whereupon 16 of 24 home owners in the block between Woodward and Second avenues petitioned the common council to change the zoning of that block to RM. Plaintiff Catherine Morgan was among the signers although she did not herself keep roomers. The common council did amend the ordinance to an RM classification, which included among its permitted uses rooming houses and

"open parking lots for the storage of self-propelled passenger vehicles, if the space used for parking is separated from all required yards and contiguous streets by an ornamental wall or fence 4 feet in height, all entrances and exits to such lots to be determined by the commission and if found by the commission to be not injurious to the surrounding neighborhood and not contrary to the spirit and purpose of this ordinance."

Since April, 1958, the building on lot 1 (formerly used by an auto dealer) has been vacant. Testimony for defendants established that a principal reason for difficulty in locating a tenant was lack of any parking facility. In February, 1959, the owners of lot 1 leased the building to the Kroger Company for a supermarket. The lease was made contingent on the lessee being able to acquire and use for parking purposes lots 2, 3, 4, 96, 97, and the east 7 feet of lot

5. The lessor has now obtained options on these lots from their owners, defendants herein.

The department of buildings and safety engineering of the city of Detroit, however, denied a permit to raze the buildings for the purpose stated, holding that customer parking was a commercial use not permitted in RM zoning.

On application to the board of zoning appeals for an exception to allow the use contemplated, the lessor was first denied and then (on rehearing) granted a permit. The board of zoning appeals found practical difficulty and unnecessary hardship and held that the proposed Kroger parking lots would not be injurious to the surrounding neighborhood. The permit was conditioned on the applicant's providing improvements in the nature of green belts, fences and specified off-street entrances and exits, to seek to mitigate the effect on the neighborhood.

Plaintiffs, 3 of whom owned a house on lot 95 immediately adjacent to 1 of the proposed parking lots and directly across the street from another of them, then commenced this suit. The testimony at trial served to establish the facts set forth above, and to record the differing views of expert witnesses called by the parties as to the effect of the proposed Kroger parking lots on the adjacent neighborhood.

At the conclusion of the hearing, the circuit judge entered a lengthy opinion denying the injunction and dismissing the bill of complaint. He specifically found that plaintiffs voluntarily sought a change in zoning to allow rooming houses, that they had abandoned the restrictions and that changed conditions in the surrounding neighborhood had made them valueless. The circuit judge spelled out at some length the integration of occupancy of the surrounding neighborhood, and emphasized the growth of the rooming-house uses in the years between the opening of the

subdivision and the present. He held plaintiffs were guilty of laches and were estopped from now enforcing the restrictions. And he held that the proposed parking lots would not only not damage plaintiffs' property, but would probably enhance it.

The racial integration of a subdivision has, of course, no bearing upon the legal rights of property owners to enforce residential restrictions. Nor does a change in use in the area surrounding the subdivision. *Monroe* v. *Menke,* 314 Mich 268; *Bohm* v. *Silberstein,* 220 Mich 278. Nor does a change in zoning override restrictions placed in deeds. *Abrams* v. *Shuger,* 336 Mich 59; *Phillips* v. *Lawler,* 259 Mich 567; *Cooper* v. *Kovan,* 349 Mich 520.

The principal questions posed by this case, as we see them, are:

(1) Does the development of substantial roominghouse usage in a residentially restricted subdivision constitute an abandonment of the restriction as to a commercial use?

(2) Assuming a negative answer to the first question, does the added factor of the commercial uses shown on this record sustain the circuit judge's finding of abandonment of the restrictions?

There is no doubt that rooming houses are inconsistent with the "single dwelling house" restriction of the Taylor subdivision. *Carey* v. *Lauhoff,* 301 Mich 168. There is also no doubt that this record clearly shows that rooming houses have become so commonplace in the Taylor subdivision as to warrant the conclusion that any restriction as to this usage had been abandoned.

The use sought to be restrained herein, however, is a customer parking lot for a supermarket. This use is an ordinary commercial use. See *Wilber* v. *Wisper & Wetsman Theatres,* 301 Mich 117. It is not consistent with even a multiple-residence restriction. If, under Michigan law, a restriction becomes

void as to all uses when it has been substantially violated as to 1 particular type of use, then certainly defendants in this case are entitled to prevail.

This, however, is not the view this Court has taken in restriction violation cases. In *Oliver* v. *Williams,* 221 Mich 471, this Court said (p 476):

"The restriction was not abandoned altogether, but only *pro tanto,* and that in an effort to comply therewith, and a material and beneficial part remains and has been uniformly observed and will be protected."

See, also, *Burns* v. *Terzian,* 233 Mich 627; *Kelman* v. *Singer,* 222 Mich 454.

In the case closest in point, *Polk Manor Co.* v. *Manton,* 274 Mich 539, the Court dealt with a suit in equity to restrain the building of a gasoline station. The restriction sought to be enforced was that no building should be erected except "for the purpose of a dwelling only." The record showed that many apartments had been built, but that the street in question was still "residential." There, as in our present case, the defendants contended that plaintiff was estopped by prior violations of the restriction. The trial court's opinion was quoted and affirmed by this Court (p 543):

"I think the conclusion is fair that in this case there is no element of waiver or estoppel; that there is a very reasonable prospect of substantial damage to the plaintiff's property; that the restrictive covenant in question is still of substantial value to the plaintiff, even as modified by acquiescence and usage; and that there is here presented a substantial controversy which appeals to a court of equity and entitles plaintiff to injunctive relief."

The holding of the *Polk Manor Case* was summarized thus (syllabus 3):

"Restrictions are, in nature, reciprocal negative easements, and while they remain beneficial to the dominant estate, material violations of them will be enjoined to the extent that they remain beneficial."

We think this is applicable to our present situation. The rooming-house violations do not estop plaintiffs from enforcing a residential restriction against a commercial parking lot.

Defendants also contend, however, that other commercial violations have been added to the rooming-house usage and that together they represent such a change in the character of the neighborhood as to represent abandonment of the restrictions.

Two of these commercial uses, we have already discussed—the automobile dealership building on lot 1, and the gasoline station on lot 98, fronting on Woodward avenue. Both of these uses followed the commercialization of Woodward avenue. They were sanctioned not by subdivision acquiescence, but by judicial decree in litigation initiated by Taylor subdivision property owners which was carried to the Supreme Court. Both uses are on the extreme eastern edge of the subdivision.

The other permanent commercial use is represented by a small flower shop fronting on Second avenue, but built on the rearmost portion of lot 86. The location of this shop is such that it hardly appears to be in the Taylor subdivision at all. There is no doubt that it represents a long-standing violation (see *Boston-Edison Protection Ass'n* v. *Allen*, 293 Mich 668) unobjected to as far as this record discloses. But it also appears to be a use which has accounted for little damage and which has done nothing to alter the basic character of the subdivision.

We have not ignored the other testimony in this record pertaining to instances of temporary business uses. Some of these seem to have been con-

ducted almost secretly and none appears to have been permitted to exist for long duration when publicly known.

All of these factors, taken into account along with the strongly expressed views of the chancellor who heard the matter and personally viewed the premises, present a strong argument for affirmation. In spite of them, however, we feel impelled to uphold the restrictions. While we give the chancellor's findings of fact great weight, we hear this equity action *de novo* on the record. *Cooper* v. *Kovan, supra.*

The testimony and pictorial exhibits contained in this record show Taylor to be a street of substantial old homes still in a good state of preservation and maintenance. Aside from the Woodward frontage, it is clearly a residential neighborhood. Cases such as *Windemere-Grand Improvement & Protective Ass'n* v. *American State Bank of Highland Park,* 205 Mich 539, and *Frigo* v. *Janek,* 237 Mich 642, are clearly not in point. Indeed, we are not able to find any evidence that the residential restriction of the Taylor subdivision has been abandoned except as to rooming-house usage. As we have pointed out, while neighborhood acquiescence in this use might constitute estoppel as to objections to other rooming houses, it does not estop plaintiffs from objecting to the construction of commercial parking lots immediately adjacent to and across the street from their homes.

In the case in which the Taylor subdivision restriction was broken as to Woodward frontage, this Court said:

"As a rule, we will uphold a restriction wherever it remains of any substantial benefit to the parties objecting to its violation, provided they are not estopped by their conduct from making such objection." *Taylor Avenue Improvement Ass'n* v. *Detroit Trust Co., supra,* 311.

This holding is in accord with 5 Restatement, Property, § 564:

"Injunctive relief against violation of the obligations arising out of a promise respecting the use of land cannot be secured if conditions have so changed since the making of the promise as to make it impossible longer to secure in a substantial degree the benefits intended to be secured by the performance of the promise.

"Comment: * * *

"*c. Change of conditions.* A change of conditions which will bring into operation the rule stated in this section is a change of such a character as to make it impossible longer to secure in a substantial degree the benefits sought to be realized through the performance of a promise respecting the use of land. If it is still possible, despite a change in conditions, to secure the anticipated benefit in a substantial, though lessened degree, the change of conditions will not alone be sufficient to warrant the refusal of injunctive relief against breach of the obligation arising from the promise."

We believe that the restrictions are still of substantial value to plaintiffs and should be enforced.

Remanded for entry of a decree in accordance with this opinion. Costs to appellants.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, KAVANAGH, and SOURIS, JJ., concurred.