MEIJER, INC v CITY OF MIDLAND

Docket No. 208698. Submitted July 6, 1999, at Lansing. Decided February 29, 2000, at 9:00 A.M. Leave to appeal denied, 463 Mich __.

Meijer, Inc., filed a petition in the Tax Tribunal challenging the valuation and assessment by the city of Midland for ad valorem property taxation in 1993 and 1994 of commercial real estate consisting of 34.26 acres and two buildings thereon, one being 188,823 square feet in size and used as a retail store and the other being 1,175 square feet in size and used as a convenience store and gasoline station. The respondent assessed the true cash value of the property at $11 million in 1993 and $11.25 million in 1994. The petitioner presented an appraiser who estimated true cash value at $6.6 million in 1993 and $6.8 million in 1994. The Tax Tribunal set true cash value at $9,133,000 in 1993 and $9,109,000 in 1994 after adjusting the cost approach valuation of the petitioner's appraiser by adding five percent for entrepreneurial profit and rejecting the petitioner's adjustment of approximately $1.9 million to its replacement cost valuation for functional obsolescence beyond the excess construction costs reflected in the difference between the reproduction and replacement costs. The petitioner appealed.

The Court of Appeals *held*:

1. The Tax Tribunal committed an error of law in determining true cash value under the replacement cost approach by failing to include a deduction for functional obsolescence due to the cost of modifying the buildings for use by another retailer if the buildings were leased or sold. The case must be remanded to the Tax Tribunal for a determination of how much functional obsolescence exists because of modification costs.

2. The Tax Tribunal committed error requiring reversal by including entrepreneurial profit in its cost approach to valuation. Entrepreneurial profit should not be a mechanical calculation and should be added to the valuation only where the property in question is of a type that is developed to make a direct profit as a consequence of the development and there is some evidence that the market price will bear the inclusion of such a profit. In this case, there was competent, material, and substantial evidence to support the conclusion that the property was of a type developed for profit.

However, there was no evidence that would support the conclusion that the market would withstand the inclusion of entrepreneurial profit to develop a 180,000-square-foot building for use by a single retailer.

Reversed and remanded for further proceedings.

1. TAXATION — REAL PROPERTY — TRUE CASH VALUE — REPLACEMENT COST APPROACH — FUNCTIONAL OBSOLESCENCE.

   Use of the replacement cost approach for determining the true cash value of realty for ad valorem property taxation eliminates the need to calculate for some, but not all, types of functional obsolescence; replacement cost eliminates functional obsolescence due to excess construction or superadequacy, but not functional obsolescence due to improvements that have utility to the present owner only and for which a buyer would incur considerable modification costs.

2. TAXATION — REAL PROPERTY — TRUE CASH VALUE — COST APPROACH — ENTREPRENEURIAL PROFIT.

   Entrepreneurial profit from development should be added to the cost valuation of realty for ad valorem property taxation where the property is of a type that is developed to make a profit as a direct consequence of the development and there is some evidence that the market price will bear the inclusion of such a profit.

*Honigman Miller Schwartz and Cohn* (by *Michael B. Shapiro* and *John S. Kane*), for the petitioner.

*Reed, Stover & O'Connor, P.C.* (by *Richard D. Reed, Patrick R. Mason,* and *Carolyn W. Schott*) and *Patricia L. Halm,* for the respondent.

Before: HOLBROOK, JR., P.J., and ZAHRA and J. W. FITZGERALD*, JJ.

ZAHRA, J. Petitioner appeals as of right from the Tax Tribunal's determination of the assessed value of a single parcel of commercial property in the city of

---

* Former Supreme Court justice, sitting on the Court of Appeals by assignment.

Midland for purposes of ad valorem[1] taxation for tax years 1993 and 1994 under the General Property Tax Act (GPTA), MCL 211.1 *et seq.*;  MSA 7.1 *et seq.*  We reverse and remand for proceedings consistent with this opinion.

FACTS

Petitioner owns a 34.26-acre parcel of land in the city of Midland on which two buildings were built in 1991 and 1992. The first building is a retail store consisting of approximately 188,823 square feet. The other building is a convenience store and gas station that is approximately 1,175 square feet. The cost of constructing the two buildings and the various site improvements was approximately $7,232,982.

The GPTA provides that assessments must be based on the property's true cash value. "Cash value" means the "usual selling price at the place where the property to which the term is applied is at the time of assessment." MCL 211.27; MSA 7.27. The usual selling price is "the price which could be obtained for the property." *Id.* All the experts who testified before the Tax Tribunal agreed that the true cash value of the subject property must be determined by finding the market value of the fee simple interest in the property, based on the assumption that the subject property is vacant and for sale.[2] Petitioner's appraiser esti-

---

[1] Black's Law Dictionary (6th ed)  defines ad valorem tax as "[a] tax levied on property or an article of commerce in proportion to its value as determined by assessment or appraisal."

[2] As observed in *First Federal Savings & Loan Ass'n v City of Flint*, 415 Mich 702, 703; 329 NW2d 755 (1982),  "the constitution and the [GPTA] require that property tax assessments be based on market value, not value to the owner."

mated that the true cash value of the subject property was $6,600,000 in 1993 and $6,800,000 in 1994. Respondent's appraiser estimated the true cash value to be $11,000,000 in 1993 and $11,250,000 in 1994.

The Tax Tribunal made an independent determination of the property's market value and found the true cash value of the property to be $9,133,000 for the 1993 tax year and $9,109,000 for the 1994 tax year. In so doing, the Tax Tribunal adjusted the cost approach valuation of petitioner's appraiser by adding five percent valuation for "entrepreneurial profit"[3] and rejecting petitioner's adjustment of approximately $1.9 million to its replacement cost valuation for functional obsolescence[4] beyond the excess construction costs reflected in the difference between the reproduction and replacement costs.[5] Petitioner claims on

[3] "Entrepreneurial profit" represents the anticipated profit of the real estate developer. *Texas Eastern Transmission Corp v East Amwell Twp*, 13 NJ Tax 24, 40 (1992), aff'd 18 NJ Tax 126 (NJ Super AD, 1999). In theory, the cost of real estate development should be less than its market value upon completion. *Id.* The difference between the cost of the project and the market value upon completion is the entrepreneurial profit. *Id.*

[4] The term "functional obsolescence" refers to a loss in value brought about by failure or inability of the assessed property to provide full utility. *Teledyne Continental Motors v Muskegon Twp*, 145 Mich App 749, 755; 378 NW2d 590 (1985), citing *The Appraisal of Real Estate* (8th ed), p 449. It includes any loss of value by reason of shortcomings or undesirable features within the property itself. *Id.* "Functional obsolescence can be caused by internal property characteristics, such as poor floor plan, inadequate mechanical output, or functional inadequacy or superadequacy due to size or other characteristics." *Id.*

[5] There exist three traditional approaches to determining true cash value: (1) the cost approach, (2) the sales approach, and (3) the income approach. *Meadowlanes Limited Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 484; 473 NW2d 636 (1991). The Tax Tribunal determines which approach provides the most accurate valuation in any given case. In this case, the Tax Tribunal utilized the cost approach. In assessing value under the cost approach, an assessor begins with the cost to construct new and then deducts depreciation. The appraiser may begin with either reproduction cost, which is the cost of producing an exact dupli-

appeal that these adjustments were not supported by the record evidence and constituted an error of law.

STANDARD OF REVIEW

Absent fraud, this Court's review of a Tax Tribunal decision is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle. *Georgetown Place Cooperative v City of Taylor*, 226 Mich App 33, 43; 572 NW2d 232 (1997). The tribunal's factual findings are upheld unless they are not supported by competent, material, and substantial evidence. *Id.* Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence. *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 352-353; 483 NW2d 416 (1992). Failure to base a decision on competent, material, and substantial evidence constitutes an error of law requiring reversal. *Id.*; *Oldenburg v Dryden Twp*, 198 Mich App 696, 698; 499 NW2d 416 (1993).

ANALYSIS

A. FUNCTIONAL OBSOLESCENCE

Petitioner first argues that the Tax Tribunal committed legal error in determining the true cash value of petitioner's property under the replacement cost

---

cate of the property, or the replacement cost, which is the cost of replacing the utility provided by the subject property using a modern design that would be preferred by a typical user of the property. Replacement structures usually cost less than reproduction structures. *The Appraisal of Real Estate* (11th ed), p 371. The difference between reproduction cost and replacement cost is referred to as "excess construction cost" and is one type of functional obsolescence. This Court has recognized that the use of the replacement cost approach eliminates some but not necessarily all forms of functional obsolescence that may exist. *Teledyne, supra* at 755.

approach when it failed to include a deduction for functional obsolescence due to the cost of modifying the buildings for use by another retailer if the buildings were leased or sold. We agree.

The issue of functional obsolescence was considered in *Teledyne Continental Motors v Muskegon Twp*, 145 Mich App 749, 756; 378 NW2d 590 (1985), where this Court held:

> Clearly, the replacement cost approach does eliminate the need to calculate some types of functional obsolescence. By definition, replacement cost eliminates functional obsolescence due to excess construction or superadequacy. However, a determination of other sources of functional obsolescence, not caused by excess construction, must at least be considered in the replacement cost approach. In the present case, the tribunal ruled that all functional obsolescence is eliminated by use of the replacement cost approach. This amounts to an adoption of the wrong appraisal principle. The tribunal should have specifically determined whether the sources claimed as functional obsolescence by the petitioner are in fact eliminated by use of the replacement cost approach. This is primarily a factual determination based upon a determination of fairness in each particular case, and we therefore do not presume to suggest a proper result. On remand, the tribunal may well determine that the elements of functional obsolescence claimed by petitioner are not proper factors to be considered in calculating replacement cost.

In this case, unlike in *Teledyne*, the tribunal did not specifically rule that all functional obsolescence was eliminated by use of the replacement cost approach. Instead, the tribunal found petitioner's calculation of functional and external obsolescence to be unrealistic and derived from inappropriate market data. We agree that petitioner's calculation of functional obsolescence was flawed for two reasons. First, petitioner

lumped all forms of obsolescence together into one deduction of twenty-six percent of the replacement cost of the building and land. This figure included some forms of obsolescence that had already been accounted for in the depreciation figures used to calculate the replacement cost. Second, obsolescence in this case only affects the value of the building, not the land value. Therefore, obsolescence should be calculated as a percentage of the building cost only and not the building and land together as petitioner attempted to do. However, the tribunal erred in failing to make its own determination of the functional obsolescence due to modification costs.

The Tax Tribunal specifically found that "the subject property includes improvements that have utility only to Petitioner and that a typical buyer in the market place would incur considerable modification costs." This is the type of functional obsolescence that is not eliminated by adoption of the replacement cost approach.

In *First Federal Savings & Loan Ass'n v City of Flint*, 415 Mich 702, 705; 329 NW2d 755 (1982), the Supreme Court held that expenditures that merely enhance the image or business of the owner should not be included in taxable value, only expenditures that add to the cash value or selling price of the property should be included. Petitioner's building contains numerous features, including but not limited to signs, facades, truck bays, and interior layouts that would have to be modified before another retailer could operate in that building. The cost of these modifications must be deducted from the replacement cost in order to determine the true cash value of the property. If a buyer could build an equivalent building for

an amount equal to the replacement cost, that buyer would not buy a building needing substantial modification unless the selling price were lower than or equal to the replacement cost less the cost to modify the property.

Once the Tax Tribunal found that a typical buyer in the market place would incur considerable modification costs, it was not free to wholly reject petitioner's claim for functional obsolescence. While the Tax Tribunal is not required to accept valuations advanced by the taxpayer or the assessing unit, it remains the duty of the tribunal to adopt a valuation that is "most appropriate to the individual case as the particular facts may indicate." *Teledyne*, *supra* at 754. Therefore, we remand to the Tax Tribunal to make an independent determination of how much functional obsolescence exists due to modification costs.

### B. ENTREPRENEURIAL PROFIT

Petitioner also argues that the Tax Tribunal's decision to add five percent for entrepreneurial profit was not supported by the evidence, resulting in legal error. Michigan courts have not addressed the issue whether, or under what circumstances, entrepreneurial profit may be added in the cost approach property valuation. The only jurisdiction to address substantively the issue of entrepreneurial profit is New Jersey. We therefore look to the New Jersey courts for guidance.

In *Texas Eastern Transmission Corp v East Amwell Twp*, 13 NJ Tax 24 (1992), aff'd 18 NJ Tax 126 (NJ Super AD, 1999),  the New Jersey Tax Court addressed entrepreneurial profit in the context of real

property assessments on segments of a natural gas pipeline. The court, quoting from *The Appraisal of Real Estate* (9th ed) observed:

> The theoretical basis for an entrepreneurial profit adjustment has been authoritatively described in the generally accepted compendium of appraisal practice as follows:
>
> "An anticipated profit is often the primary motivation for developing property. The total cost of a project before entrepreneurial profit should be less than the market value of the completed property to reward investors for their risk. The difference between cost of development and the value of a property after completion is the entrepreneurial profit or loss. This is also known as developer's profit. Whether a profit is actually realized depends on how successful the developers have been in selecting the site, constructing the improvements, obtaining the proper tenant mix, and designing the leases, and how well they have analyzed the market demand for the property."

The same treatise further observes:

> "If the cost approach is to provide a reliable indication of value, the appraiser must add to the direct and indirect costs a figure that represents the entrepreneurial or developer's profit that is reflected in the market. Some appraisers feel that entrepreneurial profit has no place in the cost approach. They contend that the existence or absence of developer's profit or loss is relevant only in the income capitalization and sales comparison approaches. Although a developer is motivated by the anticipation of profit, his or her efforts may not always be rewarded. Accordingly, it would be equally plausible to include a potential entrepreneurial loss in the cost estimate. Essentially, entrepreneurial profit is a market-derived figure that reflects the amount that the entrepreneur, or developer, expects to receive in addition to costs." [Footnote omitted.] In its summary of the cost approach, *The Appraisal of Real Estate* notes that the entrepreneurial profit adjustment should be

made only "when appropriate." [*Texas Eastern, supra* at 40 (citations omitted).]

The *Texas Eastern* court also observed:

Proper use of the cost approach requires, not a mechanical addition of 10% for entrepreneurial profit, but a critical analysis of the property in its market on the appraisal date to determine whether cost should be adjusted upward or downward to take account of market conditions. [*Id.* at 41.]

We agree with the New Jersey Tax Court that the true cash value of developed real estate may not always be reflected by the cost of the project without the inclusion of entrepreneurial profit. Market value may deviate from the cost of the project and this difference, described as entrepreneurial profit or loss, ought to be taken into account. We also agree with the New Jersey Tax Court that the addition of entrepreneurial profit ought not be a mechanical function. Determining when to factor in entrepreneurial profit is a difficult task.

Entrepreneurial profit or loss is market driven and ought to be factored into property value only if the property is of a kind whose development is undertaken to realize a profit on the property. *Brae Associates v Park Ridge Borough*, 17 NJ Tax 187, 198 (1998). When the property being appraised was actually developed by a third party with a profit motive, it is self-evident that entrepreneurial profit ought to be considered. The question is more difficult to answer when the property is developed by the assessed party for its own use. Nonetheless, we reject petitioner's argument that entrepreneurial profit should not be considered merely because the property was self-developed. Petitioner's appraiser opined:

The major reasons for not including entrepreneurial profit was that this property is a corporate type property that was built by a user for their [sic] own use, and there is typically not entrepreneurial profit in that situation.

When a property is developed on a build to suit basis with the tenant, with the lease essentially negotiated before signing, there is an opportunity for a profit to be created by the developer and often a profit is created.

However, in this case, number one, it's—it's not a build to suit property, number two, there's no lease in place and there's no entrepreneurship here.

As observed in *Texas Eastern, supra,* and *Brae Associates, supra,* the inquiry is not whether the property actually was developed with a real estate profit motive, but whether the property is of a kind whose development is typically undertaken to achieve such a profit. The New Jersey Tax Court has applied an increment of five percent or ten percent for entrepreneurial profit in several instances where the property was developed by the owner for its own use. *American Cyanamid Co v Wayne Twp,* 17 NJ Tax 542, 561 (1998) (office building/corporate headquarters). *Beneficial Facilities Corp v Peapack & Gladstone Borough,* 11 NJ Tax 359, 381 (1990), aff'd 13 NJ Tax 112 (NJ Super AD, 1992) (corporate headquarters complex); *McGinley Mills, Inc v Phillipsburg,* 9 NJ Tax 508, 517 (1988) (user-developed industrial facility); *Twin Oaks Associates v Morristown,* 9 NJ Tax 386, 397 (1987), aff'd 11 NJ Tax 94 (NJ Super AD, 1989) (regulated nursing home).

In *Texas Eastern, supra,* the court concluded that construction of a pipeline is not the type of development that is generally undertaken by developers in the expectation of profit on its sale. *Id.* at 42. *Texas Eastern* involved gas pipelines that were constructed

for interstate transportation of natural gas. Naturally, construction of a pipeline is not considered real estate development and is not undertaken by developers in the expectation of profit on its sale. However, in this case, the subject property is a retail building. Retail structures are typically developed to achieve a profit from the real estate itself; not merely from the retail business conducted within the structure. Thus, the mere fact that petitioner's property was developed for its own use does not preclude the Tax Tribunal from including entrepreneurial profit in the cost approach valuation.

Petitioner also argues that the market that existed at the time of this assessment did not support inclusion of entrepreneurial profit in the cost approach because of the significant amount of obsolescence involved if the property was sold or leased as an existing building. We agree.

Respondent's expert assessor added ten percent for entrepreneurial profit. Yet, when examined regarding the facts to support this conclusion, the expert admitted that any developer who would build a 180,000-square-foot single occupant retail space at the time of this appraisal would likely be committing "economic suicide" because there was no existing market for such a structure. There must be some evidence upon which one can support the conclusion that the market would bear the inclusion of entrepreneurial profit. In the absence of such evidence, the addition of entrepreneurial profit would be based on pure speculation.

Our holding should not be taken to mean that entrepreneurial profit is not an appropriate factor to be considered when utilizing the cost approach to

property valuation. To the contrary, entrepreneurial profit can and should be considered under the cost approach. However, entrepreneurial profit should not be a mechanical calculation and should be added to the valuation only where: (1) the property in question is of a type that is developed to make a profit as a direct consequence of the development, and (2) there is some evidence that the market price will bear the inclusion of such a profit. In this case, there was competent, material, and substantial evidence to support the conclusion that the property in question was of a type that is developed for profit—a retail outlet. However, there was absolutely no evidence that would support the conclusion that the market would withstand the inclusion of entrepreneurial profit to develop a 180,000-square-foot building for use by a single retailer. Accordingly, we find that the Tax Tribunal committed error requiring reversal by including entrepreneurial profit in its valuation.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.