*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HARTLAND GLEN DEVELOPMENT, LLC,

        Petitioner-Appellant,

v

TOWNSHIP OF HARTLAND,

        Respondent-Appellee.

UNPUBLISHED
November 21, 2019

No. 344480
Tax Tribunal
LC Nos. 11-000012-TT;
14-002513-TT
15-003485-TT

Before: REDFORD, P.J., and JANSEN and LETICA, JJ.

PER CURIAM.

Petitioner, Hartland Glen Development, LLC, appeals as of right from the Michigan Tax Tribunal's (MTT) final opinion and judgment that determined for the 2011, 2012, 2014, and 2015 tax years the true cash value (TCV), state equalized value (SEV), and taxable value (TV) for petitioner's real property of approximately 380 acres located in respondent, Township of Hartland (the township). Petitioner presently operates on the property a 36-hole golf course that includes a clubhouse, pro shop, restaurant-bar, and other outbuildings. For the reasons stated herein, we affirm the MTT's decision.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case began in 2011 when petitioner filed a valuation appeal related to the 2011 and 2012 tax years regarding property tax assessments levied by the township on the subject property. In 2015, petitioner appealed to this Court the MTT's October 2015 opinion and judgment which held that special assessments encumbering the subject property did not result in a decrease in the property's TCV. In its opinion, this Court summarized the facts found by the MTT as follows:

> A $792,000 Special Assessment was levied in 2005 for 144 Residential Equivalent Units ("REUs") for residential unit sewer taps. The annual payments were $71,000. In 2011, the Township corrected the Special Assessment and levied $2,364,596.85 for 603.14 REUs (Resolution 11-R032). Respondent also levied a Supplemental Special Assessment of $199,488.76 (Resolution 11-R034)

in 2011. [*Hartland Glen Development, LLC v Twp of Hartland*, unpublished per curiam opinion of the Court of Appeals, issued February 19, 2015 (Docket No. 318843) (*Hartland I*), 1-2].

\* \* \*

Petitioner and the township entered into a contract regarding the original 2005 special assessment for 144 REUs, but petitioner did not agree with the 2011 corrected and supplemental special assessments, which led to litigation, with an appeal currently pending in this Court in *Hartland Glen Dev, LLC v Hartland Twp*, Docket No. 321347. [*Id*. at 2 n 1.]

This Court reversed and remanded for further proceedings requiring the determination whether outstanding special assessments can and did decrease the subject property's TCV. *Id*. at 9. This Court directed, however, that the remand proceedings be held in abeyance until the resolution of petitioner's other appeal respecting the MTT's affirmance of the township's special sewer assessments which involved changes in 2011 to the 2005 initial assessment. *Id*. This Court also directed that the proceedings on remand "should entail arguments, testimony, and evidence on the issues and questions raised" and suggested that the matter might require the submission of new appraisals. *Id*. The township sought leave to appeal to our Supreme Court but it denied leave because the township failed to persuade it that the question presented required consideration before the completion of the proceedings ordered by this Court. *Hartland Glen Development, LLC v Twp of Hartland*, 498 Mich 957; 872 NW2d 493 (2015). After remand, the MTT held the case in abeyance as directed. Meanwhile, petitioner filed tax appeals related to the township's valuation of the subject property respecting the 2014 and 2015 tax years.

This Court affirmed the MTT's judgment respecting the special sewer assessments. *Hartland Glen Development, LLC v Twp of Hartland*, unpublished per curiam opinion of the Court of Appeals, issued October 20, 2015 (Docket No. 321347) (*Hartland II*). In *Hartland II*, this Court concluded that the township had statutory authority to correct the original assessment's REU allocation and to specially assess petitioner to recover a shortfall. *Id*. at 5-10. This Court observed that, as the MTT noted, petitioner's "own expert admitted that each REU provided a $2000 value addition to the subject property over the cost of the special assessment for that REU" and held that the MTT "did not err in finding that the special assessment was valid because the benefits of the special assessments to the subject property outweighed the costs." *Id*. at 12. Petitioner sought leave to appeal that decision to our Supreme Court, but on November 30, 2016, it denied leave because petitioner failed to persuade it that the questions presented should be reviewed by it. *Hartland Glen Development, LLC v Twp of Hartland*, 500 Mich 895 (2016)[1]. After our Supreme Court denied leave in the *Hartland II* case, the MTT ceased holding the *Hartland I* case in abeyance and consolidated all of petitioner's appeals for their efficient administration.

---

[1] Misidentified in Michigan Reports as *People v Hartland Township*, No. 153016; Court of Appeals No. 321347.

The MTT ordered the parties to submit new appraisals of the subject property that took into account the valid corrected and supplemental assessments for the MTT's determination whether they impacted the property's TCV. The MTT directed that it would not consider arguments regarding the validity of the corrected and supplemental assessments because of the *Hartland II* decision. The MTT held a five-day trial during which it heard the testimony of several witnesses and admitted evidence presented by the parties including appraisal reports for each of the disputed tax years submitted by the parties' respective real estate appraisal experts.

At trial, petitioner contended that the subject property's TCV equaled its potential sale price minus any outstanding special assessments liability. Petitioner's expert estimated the subject property's potential sale price at $1,150,000 and deducted the approximately $2,000,000 outstanding balance of the special assessments to derive a zero-dollar TCV. Petitioner argued that the special assessments burdened the subject property without providing any benefit and asserted that no market demand for development of the property existed at the time of valuation for each of the disputed tax years. Petitioner argued that the outstanding special assessment decreased the TCV to nothing, and therefore, it had no ad valorem tax obligation for the disputed tax years.

Respondent's expert testified that a property's TCV differs from the cash price paid by a buyer to a seller at closing in a real estate transaction because a buyer determines a property's sale price by calculating its potential highest and best use and then factors in any special assessments, liens, and encumbrances, and considers the property's conditions. Respondent asserted that a knowledgeable buyer would recognize that special assessments require later expenditures that would have to be made, and adjust the sale price accordingly, to set the amount of cash to be paid to the seller. Respondent contended that the cash paid at closing equals the value of the seller's ownership interest; whereas, the TCV constitutes the cash equivalency of the sale, i.e., the value of the seller's ownership interest plus the anticipated expenditures like those necessary to cover the cost of special assessments.

The MTT applied the sales comparison methodology to determine the subject property's value in relation to its undisputed highest and best use as residential development property. The MTT concluded that petitioner failed to meet its burden of proving that its property had a zero-dollar TCV. The MTT found petitioner's subtraction of the outstanding special assessments from the property's potential sale price an inaccurate method of TCV valuation. It relied on the MTT's previous determination that the purchase price and the anticipated expenditure for special assessments are each components of value that must be included in an appraisal methodology when determining TCV. The MTT concluded that subtraction of the special assessments from the property's value equaled the owner's equity interest. It found wanting the logic behind petitioner's valuation theory because a buyer of property who chose to finance the payment of special assessments could greatly reduce or even altogether evade its property tax liability if it could deduct the amount of the special assessments from the TCV.

The MTT also questioned how allowing such valuation could be equitable if one property owner within the same district paid the special assessments up front and another who financed the payments could deduct the balance to reduce its property tax liability to zero. The MTT found that petitioner essentially sought again to assert that the special and supplemental assessments lacked validity by arguing that they provided no benefit to the subject property

-3-

contrary to this Court's *Hartland II* ruling. The MTT found that, "if the special assessment added no value to the property, it would be invalidated, and no future payments would be due." Based on analysis of comparable property sales adjusted for dissimilarities to the subject property, the MTT concluded that the valid special assessments did not decrease the subject property's market value or negatively affect its TCV for all disputed tax years. Consequently, the MTT entered judgment that the TCV, SEV, and TV of the subject property for the disputed tax years were as follows:

| Year | TCV | SEV | TV |
| --- | --- | --- | --- |
| 2011 | $2,700,000 | $1,350,000 | $1,350,000 |
| 2012 | $2,400,000 | $1,200,000 | $1,200,000 |
| 2014 | $2,400,000 | $1,200,000 | $1,200,000 |
| 2015 | $2,400,000 | $1,200,000 | $1,200,000 |

Petitioner appeals on the ground that the MTT committed errors of law and applied wrong principles in computing the subject property's TCV. Petitioner contends that, for each disputed tax year, the subject property had a zero-dollar TCV. We disagree.

## II. STANDARD OF REVIEW

Review of an MTT case is governed by Const 1963, art 6, § 28 which in relevant part provides:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

> * * *

> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation.

Error of law or the adoption of wrong principles occurs under this constitutional provision when the MTT's decision is not supported by competent, material, and substantial evidence. *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 388; 576 NW2d 667 (1998). When facts are undisputed and fraud is not alleged, our review is limited to whether the MTT made an error of law or adopted the wrong principle. *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 482-483; 473 NW2d 636 (1991).

In *Menard, Inc v Escanaba*, 315 Mich App 512, 519-520; 891 NW2d 1 (2016), this Court recently summarized the standard of review as follows:

> In the absence of fraud, our review of the tribunal's determinations "is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle." *Meijer, Inc v Midland*, 240 Mich App 1, 5; 610 NW2d 242 (2000). "The tribunal's factual findings are upheld unless they are not supported by competent, material, and substantial evidence." *Id*. Substantial evidence is "evidence that a reasoning mind would accept as sufficient to support a conclusion." *Kotmar, Ltd v Liquor Control Comm*, 207 Mich App 687, 689; 525 NW2d 921 (1995). "Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence." *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 352-353; 483 NW2d 416 (1992). "Failure to base a decision on competent, material, and substantial evidence constitutes an error of law requiring reversal." *Meijer*, 240 Mich App at 5. The entire record, "not just the portions that support the agency's findings," must be reviewed when evaluating the tribunal's final determination. *Stege v Dep't of Treasury*, 252 Mich App 183, 188; 651 NW2d 164 (2002). Further, cursory rejection of evidence is also erroneous. *Jones & Laughlin Steel Corp*, 193 Mich App at 354.

### III.  ANALYSIS

Petitioner first argues that the MTT committed an error of law in its application of the sales comparison approach to the subject property because it premised its decision on the belief that the special assessments debt obligation can have no impact on the property's TCV. Petitioner contends that the special assessments in this case effectively wiped out the property's TCV by exceeding the property's market value which declined significantly following 2008. We disagree.

Michigan's Constitution requires the uniform general ad valorem taxation of real and personal property located in Michigan, unless exempt by law, based upon its true cash value. Const 1963, art 9, § 3.  The Legislature defined "true cash value" in relevant part in MCL 211.27(1) as follows:

> As used in this act, "true cash value" means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale.

> * * *

> In determining the true cash value, the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; minerals,

-5-

quarries, or other valuable deposits not otherwise exempt under this act known to be available in the land and their value.

A special assessment is a lien upon property but it is not a tax. *Kadzban v City of Grandville*, 442 Mich 495, 500; 502 NW2d 299 (1993). Unlike a tax, a special assessment is imposed to defray the costs of specific local improvements that confer benefits upon property, rather than to raise revenue for general governmental purposes. *Id*. Special assessments generally enhance the value of the property in the special district in which the improvement has been made. *Id*. Whether and how much the value of land has increased as a result of improvements "is factual, to be determined on the basis of the evidence presented by the parties." *Id*. at 502.

In *President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 637; 806 NW2d 342 (2011), this Court explained that "Michigan courts have considered 'true cash value' as being synonymous with 'fair market value.' " Michigan courts "have generally recognized that the three most common approaches to valuation are the capitalization-of-income approach, the sales-comparison or market approach, and the cost-less-depreciation approach." *Id*. at 639 (quotation marks and citation omitted). "However, variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to fair market value." *Great Lakes Div of Nat'l Steel*, 227 Mich App at 390 (citation omitted). This Court provided further that:

> a valuation method is wrong only if it does not lead to the most accurate determination of the taxable property's true cash value or fair market value. Thus, the Tax Tribunal has a duty to select the approach which provides the most accurate valuation under the circumstances of the individual case. [*President Inn*, 291 Mich App at 639 (quotation marks and citation omitted).]

For the valuation analysis, an appraiser must analyze "data mathematically to determine an estimate of the fair-market value of both the physical real estate and all the interests, benefits, and rights inherent in ownership of that real property." *Meadowlanes*, 437 Mich at 502 (citation omitted).

A petitioner bears the burden of proving the TCV of a property subject to a dispute regarding a special assessment. *Menard Inc*, 315 Mich App at 520 (citing MCL 205.737(3)). In *Menard Inc*, this Court explained the burden of proof:

> The burden of proof encompasses two concepts: "(1) the burden of persuasion, which does not shift during the course of the hearing; and (2) the burden of going forward with the evidence, which may shift to the opposing party." *Jones & Laughlin Steel Corp*[, 193 Mich App at 354-355]. Nevertheless, because Tax Tribunal proceedings are de novo in nature, the Tax Tribunal has a duty to make an independent determination of true cash value. *Great Lakes Div of Nat'l Steel Corp*[*v Ecorse*, 227 Mich App 379, 409; 576 NW2d 667 (1998)]. Thus, even when a petitioner fails to prove by the greater weight of the evidence that the challenged assessment is wrong, the Tax Tribunal may not automatically accept the valuation on the tax rolls. *Id*. at 409. Regardless of the method employed, the

Tax Tribunal has the overall duty to determine the most accurate valuation under the individual circumstances of the case. *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 485-486, 502; 473 NW2d 636 (1991). [*President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 631; 806 NW2d 342 (2011).] [*Id.* at 520-521.]

This Court directed:

To determine true cash value, the property must be assessed at its highest and best use. The concept of "highest and best use" recognizes that the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it. The concept is fundamental to the determination of true cash value. "Highest and best use" is defined as the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use. The tribunal is required to make a determination of a subject property's highest and best use. [*Id.* at 522 (quotation marks, alterations, and citations omitted).]

The MTT must employ its expertise and exercise its independent judgment to determine a valuation process that leads to a well-supported conclusion of the most accurate valuation under the circumstances. *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 389. The MTT "is not bound to accept the parties' theories of valuation. It may accept one theory and reject the other, it may reject both theories, or it may utilize a combination of both in arriving at its determination of true cash value." *Id.* at 389-390 (citation omitted).

In this case, petitioner owns the subject property in fee simple, and although the record reflects that petitioner historically intended to develop the property for residential use, it has used the property as a 36-hole golf course with supporting business-related facilities, and held it for later development. Evidence establishes that petitioner voluntarily agreed to the allocation of 720 REUs for sewer taps for the subject property and the township originally assigned 144 REUs to it in 2005. The record reflects that the township made the public improvement sewer system as agreed by the parties. In 2011, the township corrected the number of assigned REUs by resolution so that the property now has 603.14 REUs. In *Hartland II*, this Court upheld the township's corrective action and affirmed the MTT's determination of the validity and proportionality regarding the allocation of 603.14 REUs to the subject property. This Court also affirmed the MTT's finding that planned development served as the property's highest and best use.

Petitioner challenges the ad valorem tax assessments for the subject property for tax years 2011, 2012, 2014, and 2015, on the ground that the corrected and supplemental special assessments imposed an outstanding liability that petitioner contends reduced the TCV to zero-dollars for the disputed tax years. For valuation purposes, the parties and the MTT agreed that the subject property's highest and best use would be as vacant land held for future residential development. The parties and the MTT also agreed that the sales comparison approach (otherwise called the market approach) provided the most meaningful and appropriate means of determining the subject property's TCV.

Although petitioner agreed with the highest and best use determination and agreed that the sales comparison approach provided the most appropriate means of determining the TCV, petitioner's appraisal expert's valuation theory nullified the highest and best use determination. To support his zero-dollar TCV conclusion, petitioner's expert calculated a sale price for the subject property then deducted the outstanding special assessments to derive a negative value for the subject property. He asserted that the highest and best use for the property during the disputed tax years could never be realized because no market demand existed or likely ever would exist to support development of the property for residential use in the future. He contended that the 2008 downturn in the economy and the reduced number of building permits issued by the township required concluding that the subject property could never use 603.14 REUs. He concluded, therefore, that the REUs contributed no value to the subject property requiring the deduction of the outstanding special assessments rendering the property valueless.

The MTT considered petitioner's TCV analysis but concluded that it suffered from serious flaws because it required finding that the property actually cannot be used for its determined highest and best use for the disputed tax years and maybe never. We find that the MTT correctly found petitioner's analysis inadequate because it fails to consider the legally permissible, physically possible, financially feasible, and the reasonably probable use of the property that would result in the highest value for the tax years in question. The MTT incisively discerned that petitioner's valuation analysis improperly rendered the property's highest and best use no use at all. Such analysis makes the highest and best use meaningless by failing to truly consider the anticipated and projected best use of the property. The MTT appropriately recognized that a use that cannot be realized cannot be the highest and best use of a property.

Michigan law establishes that the highest and best use analysis requires contemplation of the profitable and advantageous use that an owner may make of the property in the future, even if the property is presently used for a different purpose or is vacant. *Menard, Inc*, 315 Mich App at 522. Because petitioner's TCV valuation theory fundamentally negated the subject property's highest and best use to support its contention that the subject property had a zero-dollar TCV, the MTT could properly disregard it. We find no error of law or wrong principle applied by the MTT in this regard.

Proper TCV analysis under the comparable sales approach required consideration of comparable properties within the locale, adjusted for dissimilar characteristics to enable appropriate comparison. MCL 211.27(1). In this case, the MTT considered the comparable properties presented by both parties. Although petitioner agreed that the sales comparison approach served as the best valuation methodology, petitioner's expert testified that no properties that he considered actually had comparable qualities for comparison and valuation purposes. Petitioner's TCV valuation, therefore, suffered from a further flaw that the MTT appropriately recognized.

The record reflects that the MTT appropriately considered the comparable properties and the analysis provided by respondent's expert appraiser. The MTT determined that the comparable properties presented by respondent served best for the subject property's TCV determination because they were vacant land sales adjusted to be consistent with the characteristics of the subject property. The record reflects that respondent's expert applied an appraisal method that analyzed the available data mathematically to determine an estimate of the

fair market value of both the physical real estate and all the interests, benefits, and rights inherent in ownership of that real property as prescribed by our Supreme Court in *Meadowlanes*.

The MTT found two comparable properties significant because the buyer of one purchased the property that had outstanding special assessment liability for 72 REUs and the buyer of the other bought the property despite its having outstanding special assessment liability for 100 REUs. The MTT concluded from analysis of these two sales that, contrary to petitioner's contention, special assessments do not decrease a property's value or impact its salability. These two comparable sales also established that petitioner's expert incorrectly premised his valuation theory on a false assumption that no rational buyer would ever take on outstanding special assessment liabilities. In both of these comparable sales, the buyers negotiated purchases that inherently factored the outstanding special assessments into the ultimate sale price by adjusting the amount of cash paid at closing for the properties. The one buyer assumed the substantial special assessment liability for 72 REUs, and the other buyer paid off the special assessment liability for 100 REUs after the sale. The record reflects that petitioner did not and could not rebut the MTT's conclusion that outstanding special assessments do not negatively impact a property's TCV as contended by petitioner. The comparable properties that respondent's expert analyzed for his appraisal reports provided the MTT competent, material, and substantial evidence from which the MTT could reasonably draw conclusions in this regard.

The record indicates that the MTT analyzed all of the comparable properties presented and found that respondent's comparable property number one,[2] referenced in respondent's expert's appraisal report for the 2014 and 2015 tax years, served as the best comparable property for comparison purposes because of its location within the special assessment district, its close proximity to the subject property, its wetlands like the subject property, and that the buyer assumed the outstanding special assessments at the time of purchase. That approximately 76-acre property sold despite having outstanding special assessments liability for 80 REUs. Under respondent's expert's analysis, with adjustments for dissimilar characteristics and market conditions, that comparable property established, for comparison purposes, that it had a $6871 per acre value. The MTT concluded from analysis of this comparable property sale that outstanding special assessments did not decrease the value or salability of property. We find no error of law or wrong principle applied by the MTT in this regard.

The evidence presented by respondent established that outstanding special assessments do not diminish a property's value and are not deductible to derive a property's TCV. The evidence established the validity of respondent's expert's appraisal methodology. The evidence presented respecting respondent's comparable properties established that rational buyers perform due diligence and determine a property's inherent value for its highest and best use, and they consider and take into account the existence of outstanding special assessments when calculating

---

[2] Respondent's expert also referred to this property as comparable sale number six in his appraisal report for the 2011 and 2012 tax years. Petitioner's expert similarly used this property for sale comparison in his appraisal report for the 2011 and 2012 tax years as comparable property number three.

the sale price they are willing to pay sellers in arm's length transactions. Respondent's valuation methodology recognized that the sale price inherently acknowledges the outstanding special assessments and the value they confer on the property. The record reflects that comparable property number one sold during 2009, after the economic downturn that petitioner claimed rendered the subject property valueless. The evidence established that sales of similar properties occurred despite their having substantial outstanding unpaid special assessment liabilities that ran with the land, and despite the economic conditions affecting the real estate market.

We find no merit to petitioner's argument that the special assessments provided the property no value whatsoever. That argument completely ignores this Court's previous ruling in *Hartland II*. Petitioner's deduction of the outstanding balance of the special assessments to derive a negative TCV lacked merit, and the MTT did not err by concluding that petitioner's subtraction of the outstanding special assessments from the property's potential sale price constituted an inaccurate method of valuing the property's TCV.

The MTT did not commit an error of law or wrong principle by applying a valuation methodology that determined that the cash sale price paid by the buyer to the seller for each comparable property equaled the value of the respective seller's ownership interest. The MTT did not err by concluding that the TCV equals the outstanding special assessments plus the owner's equity. The valuation method applied by the MTT revealed and acknowledged the principle that, because a buyer must either assume or pay off special assessments, a rational buyer will not pay the seller a price above the amount of the seller's ownership interest. Nevertheless, when considering a property's highest and best use, a rational buyer discerns the value contribution of special assessments to a property's actual TCV. The MTT correctly concluded that a buyer would consider the expenditures that would have to be made in the future when determining the present cash price to pay for a property, and that such buyer would arrive at a property value, then subtract the anticipated special assessments payments to set the actual purchase price such buyer would willingly pay. This TCV analytical framework accurately reflects inherent market conditions and the highest and best use of a property.

The appropriate appraisal methodology for determining the TCV in this case required including the balance of the outstanding special assessments. We find that the MTT made the most accurate valuation under the individual circumstances of the case by using a valuation process well-supported by competent, material, and substantial evidence in the whole record. The comparable sales approach employed in this case by the MTT did not derive the TCV from an estimated cash sale price. Nevertheless, the valuation methodology applied by the MTT accurately and reasonably related to the fair market value of the property because it rendered the most accurate determination of the taxable property's TCV (inherent fair market value) as required of any methodology for valuation purposes. *President Inn*, 291 Mich App at 639. Therefore, the MTT did not err by ruling that the valid corrected and supplemental special assessments did not negatively affect the subject property's TCV for the tax years in question.

Petitioner argues that the MTT erred and applied the wrong legal principles by premising its judgment on the belief that a special assessment can never adversely affect the TCV of a property. Petitioner argues that *Baker v State Land Office Bd*, 294 Mich 587; 293 NW 763 (1940), and *Municipal Investors Ass'n v Birmingham*, 298 Mich 314; 299 NW 90 (1941), aff'd 316 US 153; 62 S Ct 975; 86 L Ed 1341 (1942), support its position that the subject property had

a zero-dollar TCV. Petitioner contends that these two cases stand for the proposition that economic calamity drastically affects market conditions so that "the burden of special assessments can extinguish the TCV of property for which there is no market." Petitioner's argument lacks merit because these two cases are inapposite to the case at hand.

In *Baker*, our Supreme Court considered whether a plaintiff was entitled to a writ of mandamus to compel the State land office board to repay him the money he had paid to obtain a quitclaim deed to property he previously owned before the land board took title to it because of tax delinquency following the economic collapse in the aftermath of the Great Depression. The Supreme Court recounted that the speculative unrestrained real estate investment activities of the 1930s resulted in platting of subdivisions with lots sold for highly inflated prices; this stimulated municipalities to approve public improvements and excessively high property assessments that became delinquent when the economy collapsed in the Great Depression. Such speculative investment properties were abandoned and various efforts to remedy the situation failed. *Id*. at 591-594. The Legislature responded by enacting a statute that provided that tax delinquent lands subject to tax sales came under the jurisdiction of the State land board which had authority to resell such lands stripped of liens for taxes and assessments. *Id*. at 594-596. Our Supreme Court considered the plaintiff's various claims that the enacted statute suffered from unconstitutional defects. *Id*. 597-605. The Court held that the plaintiff failed to overcome the presumption of constitutionality of the statute in question and failed to establish any inequity in its application. The Court noted that the statute enabled municipalities through the State's acquisition and resale of the tax delinquent properties to secure a portion of unpaid taxes rather than nothing, and the statute restored lands to the taxpaying base instead of allowing them to accumulate tax delinquencies with no hope of ever recovering them. *Id*. at 605-606.

In *Municipal Investors Ass'n*, the plaintiff held bonds issued by the defendant's predecessor village to finance public improvements and the defendant partially paid on some of the bonds the plaintiff held, but lacked sufficient funds to pay all of them. The lots in subdivisions had special assessments levied for public improvements, but owners did not pay the special assessments resulting in their sale at an annual tax sale in 1938 and title passed to the State upon failure of the owners to redeem the properties. The plaintiff sued for a writ of mandamus to compel the defendant to reassess the property in the district and levy additional deficiency assessments in an amount sufficient to pay the principal and interest of the outstanding bonds that the plaintiff held. *Municipal Investors Ass'n*, 298 Mich at 318-320. Our Supreme Court quoted the passage in *Baker* regarding the speculative real estate activities that led to the enactment of the 1937 amendment to the general property tax law to remedy the situation. The Court reaffirmed its rulings in *Baker* and concluded that when title to lots "became absolute in the State of Michigan upon expiration of the period of redemption provided by the tax law free of all taxes and other liens and encumbrances of whatever kind or nature, and future and deficiency as well as past assessments and taxes were cancelled." *Id*. at 325. The Court explained that to hold otherwise would undermine the remedial legislation and give rise to the same vicious cycle. The Court explained that title vested in the State absolutely and empowered it to dispose of the property and originate a new chain of title free of any encumbrances. *Id*.

Both *Baker* and *Municipal Investors Ass'n* establish that the Legislature empowered the State to take title to tax delinquent lands and resell them free of liens to restore them to the tax

paying base. Neither case stands for the proposition that an economic downturn requires municipalities to nullify the value conferred on properties by completed public improvements in an assessment district or requires deduction of outstanding special assessments to derive the properties' TCV. Nor do the two cases intimate that a property owner can evade paying property taxes under the valuation methodology proposed by petitioner in this case. Further, neither case considered or discussed TCV valuation or the diminishment of a property's TCV to zero because of the existence of outstanding special assessments. *Baker* and *Municipal Investors Ass'n* do not support the conclusion advocated by petitioner in this case that special assessments can extinguish the TCV of a property. Moreover, petitioner has failed to establish that the market for real property during the disputed tax years resembled the aftermath of the Great Depression. *Baker* and *Municipal Investors Ass'n* addressed how a statutory response to the 1930's market downturn should be applied. There has been no equivalent legislation adopted to address the 2008 downturn. Although sales and new construction suffered during the recent economic downturn, the comparable properties presented to the MTT established that sales of comparable properties occurred thereafter. Thus, the MTT relied on competent, material, and substantial evidence for its valuation.

The record also reflects that, although petitioner failed to pay its property taxes for 2011, 2012, 2013, and 2014, petitioner did not abandon the tax delinquent subject property. Rather, petitioner held the property and paid the delinquent taxes to avoid tax foreclosure and forfeiture of the property. We hold that the MTT correctly found that such conduct belied petitioner's claim the property was worthless. Further, the record indicates that petitioner took steps to move forward with its intention to develop the subject property for its highest and best use by submitting a conceptual plan and obtaining rezoning of a 73-acre section for high-density residential development. Such conduct differentiates this case from the conditions that led the State to take title to tax delinquent properties in the aftermath of the Great Depression. The novel valuation approach espoused by petitioner is not supported by Michigan law. No law requires a taxing authority to deduct outstanding special assessments from an estimated potential sale price to derive the property's TCV. The MTT, therefore, properly rejected petitioner's valuation methodology. Adoption of such a TCV valuation method would improperly permit petitioner to evade its property tax obligations for the disputed tax years.

We conclude that the MTT correctly held that the unpaid special assessments did not impact the subject property's TCV because competent, material, and substantial evidence on the whole record supported its conclusion. The MTT correctly ruled that the existence of unpaid outstanding special assessments does not and cannot negate a property's TCV, and did not do so in this case.

In the same vein, petitioner argues that the MTT erred by not taking into account the fact that petitioner's property suffered from the collapse of the housing market after speculative improvements were funded by the township's special assessments, making the related debt obligation far in excess of the property's market value and warranting the extinguishment of the tax liens or their deduction from the property's TCV. Petitioner maintains that the special assessments' liability provided the property no proportionate contribution to its value, and therefore, it must be deducted from the property's TCV to derive a zero-dollar TCV. We disagree

In *Hartland II*, this Court upheld the MTT's previous decision that the special assessments were valid and proportionate and concluded that the special assessments conferred a benefit on the subject property in excess of the cost. This Court did not state nor intimate that its rulings respecting the special assessments in this case only applied to 2005 and that those were not the law of the case. The MTT properly relied upon this Court's determinations and applied them in this case.

Petitioner's argument suffers from a number of flaws. The MTT properly discerned that petitioner's argument, in essence, attempted to rechallenge the propriety of the special assessments, an argument that petitioner previously made and lost when this Court rejected it in *Hartland II*. Petitioner relied upon its expert's valuation built upon the incorrect premise that the highest and best use equaled no use at all. Moreover, petitioner's approach disregarded the actual applicable comparable sales that, with appropriate adjustments for market conditions, location, size, site utility, including wetlands, provided the best evidence for determining the subject property's per acre value. The record reflects that the MTT derived the subject property's TCV by multiplying that per acre appraised value by the subject property's acreage and then it deducted the demolition costs required to prepare the property for its highest and best use, residential development. Thus, the evidence presented to the MTT did not support petitioner's claim that the property was worthless during the disputed tax years.

The MTT also did not err by considering the broader consequences of the valuation methodology advocated by petitioner. The logical consequences included petitioner not only evading its property tax obligations for the disputed tax years but also potentially evading some or all of its property tax obligations for years to come. The MTT correctly discerned that accepting petitioner's valuation approach would not lead to the most accurate determination of the taxable property's TCV. Moreover, the MTT correctly understood that acceptance of petitioner's proposed methodology would create a taxation disparity among similarly situated property owners who either paid off their special assessments or assumed the obligation to pay installments on the outstanding special assessments after purchasing properties within the district. The MTT properly rejected that valuation method, recognizing that, if implemented, it would lead to a result contravening Michigan's general property tax law, MCL 211.1, which requires that all land must be taxed. Further, property taxation may not burden only some and exclude others unless specifically statutorily exempted. The MTT recognized that some property owners could inequitably evade paying property taxes by using their special assessments obligation to reduce dollar for dollar their property taxes to zero, while others within the same district could not do so if they paid their special assessments up front. Further, the MTT correctly observed that a municipality could not make public improvements if its funding sources were diminished or obliterated as advocated by petitioner. Adoption of petitioner's valuation approach would lead to an inadvisable result. Therefore, the MTT properly rejected it. The MTT did not err by discerning that petitioner's arguments for a zero-dollar TCV effectively represented an improper challenge to the validity and proportionality of the corrected and supplemental special assessments in disregard of this Court's *Hartland II* rulings that upheld the MTT's previous decision that the special assessments were valid and proportionate and that they conferred a benefit on the subject property in excess of the cost.

Petitioner also argues that the soil conditions made the subject property incapable of development such that the allocated 603.14 REUs were useless. In turn, petitioner's inability to

-13-

use the REUs required deduction from the TCV, resulting in a zero-dollar TCV. Petitioner's argument lacks merit.

The record in this case establishes that the MTT considered the evidence presented regarding the soil conditions and the estimated remediation and associated costs that might be incurred for development of the subject property for its highest and best use, including utilization of the allocated REUs. The MTT considered the evidence of a soil boring report and the testimony by a witness who estimated potential costs related to a development project that included acreage in addition to the subject property. The MTT correctly found that the evidence failed to establish that the remediation costs would quantifiably impact the TCV. The MTT based its finding on the undisputed fact that the estimated costs were not quantified in final form. No witness testified that the remediation costs would quantifiably impact the TCV. The MTT appropriately considered petitioner's expert's testimony and his appraisal reports in which he admitted that development of the subject property would not be rendered impossible by the soil conditions and that residential development could command prices that would mitigate the costs and minimize the risks.

The MTT also based its TCV determination on comparable properties that buyers purchased despite having similar wetland areas. Further, the MTT appropriately considered respondent's expert's testimony that different development scenarios could be used to enable petitioner to use all of the REUs allocated to the subject property. The evidence also established that petitioner's concept plan, used to obtain rezoning of 73 acres for high-density residential development, supported the conclusion that the subject property could be developed so as to use all allocated REUs. The record evidence fails to support petitioner's contention that it cannot use the REUs and develop the property for its highest and best use. Petitioner's argument that the MTT did not acknowledge or take into account the subject property's soil conditions is not supported by the record. Accordingly, petitioner's argument in this regard fails.

Petitioner also argues that the valuation methodology used by the MTT in this case, if applied to comparable property number one, would render a different SEV than the township's assessor determined for that property. Petitioner asserts that the MTT's valuation methodology violates the constitutional ad valorem taxation uniformity requirement. An issue is preserved for appeal if it was raised, addressed, or decided by the trial court or administrative tribunal. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005). In this case, petitioner did not raise or argue before the MTT that the valuation method adopted by the MTT violated the constitutional ad valorem taxation uniformity requirement. Instead, petitioner argued only that the assessor used the sale price for making its assessment and that the appraised sale price its expert derived could be reduced by the outstanding special assessment liability. Because petitioner did not raise this constitutional claim of error before the MTT and the MTT did not address the issue and rule on it, petitioner failed to preserve for appeal this constitutional claim of error.

We review unpreserved constitutional claims for plain error affecting substantial rights. *Total Armored Car Serv, Inc v Dep't of Treasury*, 325 Mich App 403, 412; 926 NW2d 276 (2018). "To establish an entitlement to relief based on plain error, the injured party must show (1) that an error occurred, (2) that the error was plain, and (3) that the plain error affected [its]

substantial rights. To merit relief, the injured party must show prejudice, i.e., that the error affected the outcome of the MTT proceedings." *Id.* (quotation marks and citation omitted).

The record reflects that the MTT based its decision on competent, material, and substantial evidence on the whole record and did not commit any error of law when it determined that the subject property's TCV was not impacted or reduced by outstanding unpaid special assessments. The MTT correctly rejected petitioner's valuation methodology for several reasons and it appropriately employed the sales comparison method to determine the TCV of the subject property from analysis of comparable property sales which, when adjusted for dissimilarities to the subject property, provided an accurate means of determining the subject property's TCV in relation to its highest and best use. The MTT's decision rested on sound legal principles and prevented petitioner from improperly evading its ad valorem tax obligation. Accordingly, petitioner cannot establish that the MTT committed plain error or that its decision affected petitioner's substantial rights.

Further, petitioner cannot argue that the MTT's valuation for the subject property's TCV, based on the sales comparison analysis of the comparable properties including comparable property number one, resulted in a violation of the constitutional ad valorem taxation uniformity requirement. Respecting comparable property one, the record reflects that the township assessor derived the assessed value for that property based solely on the cash sale price for that property which sold in 2009 at a sheriff's sale following bank foreclosure and loss of the property by a developer who had obtained approval for residential development. The record reflects that the buyer purchased the property to develop 20 acres for a church with the remaining acreage held for residential development in the future. The township assessor's testimony indicated that he did not make a highest and best use analysis and did not endeavor to determine that property's TCV based on its highest and best use as residential developed property. The township assessor testified that he did not take into consideration special assessments, the assumption of the liability to pay them over time, the number of REUs, or other considerations when valuing that property. Although the township assessor could have done so, he simply used the cash sale price to make the tax assessment for the property. Our Supreme Court has clarified that "the sales price of property does not necessarily determine the true cash value of the property." *Washtenaw County v State Tax Comm'n*, 422 Mich 346, 366; 373 NW2d 697 (1985) (citation omitted).

Respondent's expert considered that comparable property's highest and best use and derived a TCV for it by using the TCV valuation methodology for sales comparison purposes for use in appraising the subject property. He noted that the comparable property, not unlike the subject property, was held for future residential development and had 80 REUs for sewer allocated to it in the same district. When the property sold in 2009, the buyer paid $320,000 and assumed the special assessments liability of $386,361.25. Respondent's expert calculated the TCV for the comparable property to derive the per acre value for comparison purposes after making adjustments for the dissimilar features of that comparable property. He included the value-influencing benefits that accrued to the owner by having available 80 REUs for that comparable property's development. Respondent's expert testified that he analyzed recent sales of similar properties, compared them with the subject property, and adjusted the sales prices of the comparable properties to reflect interest differences. To make a mathematically sound analysis, he considered the cash sale prices of the comparable properties plus the REUs and derived TCVs enabling calculation of the per acre value to then apply to the subject property.

Respondent's expert's methodology acknowledged that REUs allocated to a property have value that should be considered in deriving a property's TCV.

The record reflects that the township assessor did not make a TCV determination based on a highest and best use analysis, the advantages or disadvantages of the location, its quality of soil, zoning, existing use, the value of the allocated REUs, or other features for determination of the comparable property's value for comparison purposes. The record indicates that the township assessor did not ascertain the actual TCV for determining the SEV and TV, but relied entirely on the cash sale price. Although the township assessor could have applied a more in-depth analysis, he chose the cash sale price for the tax assessment of that comparable property.

Petitioner has not established that the MTT committed plain error respecting the subject property's TCV valuation or, if even there was plain error, that it affected petitioner's substantial rights. Rather, at most, petitioner's argument reveals that the township assessor could have undertaken a different and likely more thorough methodology of assessing comparable property one. Respondent could not assess the subject property in the same manner as the township assessor assessed comparable property one by using a cash sale price because the subject property did not recently sell. Accordingly, under the circumstances presented in this case, the MTT had to determine the subject property's TCV based on its highest and best use under the sales comparison method. Petitioner's claimed zero-dollar TCV lacked both an evidentiary and legal foundation. We conclude that value-influencing factors, like the benefits that accrue from allocated REUs to real property held for future development, should be considered and reflected in the assessment process to the extent that they influence the value of the subject real property. The MTT did not err by relying on the methodology presented by respondent to derive an accurate TCV for the subject property based on the comparable properties presented by the parties including comparable property number one. The methodology used in this case made it possible to achieve valuation for assessment of the real property under the circumstances presented in this case.

Affirmed.

/s/ James Robert Redford
/s/ Kathleen Jansen
/s/ Anica Letica